# EXHIBIT 1

**[STATE-COURT PROCESS, PLEADINGS, AND ORDERS]**

STATE OF INDIANA      )      IN THE DUBOIS CIRCUIT COURT
                       ) SS:
COUNTY OF DUBOIS     )      CAUSE NO. _____

19C01-2307-PL-000428

KIMBALL ELECTRONICS GROUP, LLC,   )
                                         )
               Plaintiff,       )
                                       )
             v.               )
                                       )
DIRECT COMPONENTS, INC.,       )
                                       )
             Defendant.     )

## **COMPLAINT**

Plaintiff Kimball Electronics Group, LLC ("Plaintiff" or "KEG"), by counsel, for its

Complaint against Defendant Direct Components, Inc. ("DCI"), states as follows:

1.     KEG is an Indiana limited liability company with its principal office located at

1205 Kimball Blvd., Jasper, Indiana 47546.

2.     DCI is a corporation organized and existing under the laws of the State of Flor-

ida, with a principal office located at 5439 Beaumont Center Blvd., Suite 1040 in Tampa,

Florida.

3.     This Court has jurisdiction over the parties pursuant to Indiana Trial Rule

4.4(A)(1), (3) and (4).

4.     Preferred venue lies in this Court under Indiana Trial Rule 75(A)(6) and (10).

1

5.     This case involves DCI's sale of counterfeit, noncomforming, and defective components to KEG, which KEG unknowingly purchased for incorporation into printed circuit boards.

6.     KEG purchased the components from DCI subject to Purchase Orders that included Conditions of Purchase.

7.     Among the Conditions of Purchase is the following term:

> Any action or proceeding seeking to enforce the terms of the Order [or these Terms], or based on any right arising out of the Order [or these Terms] or transactions hereunder, must be brought in state court of competent jurisdiction located in Dubois County, Indiana, USA, . . . and the parties hereto consent to the jurisdiction and venue of said courts.

8.     DCI also agreed to supply components to KEG pursuant to the terms of a Global Supplier Quality Manual ("Quality Manual"). A true and accurate copy of the Quality Manual, as revised and accepted by DCI, is attached as **Exhibit 1**.

9.     The Quality Manual specified that component suppliers were to meet ISO9001 minimum quality requirements and required that all products be free from any counterfeit material.

10.    The Purchase Orders specified that the components to be supplied come be manufactured by Asahi Kasei Microsystems Co. (also known as AK Microsystems or AKM), Infineon, and STMicroelectronics.

11.    KEG's inspection process noticed irregularities on the components sold by DCI.

Case 3:23-cv-00139-RLY-CSW   Document 1-1   Filed 08/24/23   Page 4 of 56 PageID #: 11

12.    KEG isolated the components to prevent their incorporation into printed circuit boards to be sold to KEG's customer, which sells (among other things) electrical components to automobile producers.

13.    KEG ordered third-party tests by two companies to determine whether the components were safe, conforming, and authentic as represented and warranted by DCI.  The results of the tests established that the components DCI sold to KEG were non-conforming and potentially counterfeit.

14.    Upon discovering the components were of substandard quality and potentially counterfeit, KEG took prompt steps to prevent their reintroduction into the supply chain. This included quarantining the components that failed at least one of the two third-party tests.

**COUNT 1: BREACH OF WARRANTIES FOR COMPONENTS
DELIVERED PURSUANT TO PURCHASE ORDER 4502820617**

15.    KEG incorporates Paragraphs 1-14 as if restated here.

16.    A true and accurate copy of KEG Purchase Order 4502820617 is attached as **Exhibit 2**.

17.    DCI warranted to KEG that the components delivered pursuant to Purchase Order 4502820617 were manufactured by Asahi Kasei Microsystems Co.

18.    DCI further warranted to KEG that the components delivered pursuant to Purchase Order 4502820617 were merchantable, free from all defects in design, workmanship

and materials, and would be fit for the particular purposes for which they are intended, and that the products were provided in strict accordance with the specifications and/or to samples, drawings, designs or other requirements (including performance specifications) supplied.

19.   DCI also warranted to KEG that all products delivered pursuant to Purchase Order 4502820617 would conform to the requirements of the Quality Manual.

20.   DCI supplied nonconforming components, in breach of its warranties.

21.   KEG has been damaged as a result of DCI's breaches of warranties.

WHEREFORE, KEG respectfully requests that judgment be entered in its favor and against DCI on Count 1 of the Complaint in an amount to be proven, and that KEG also be awarded interest, attorneys' fees, expenses and costs of collection, and all other just and proper relief.

### COUNT 2: BREACH OF WARRANTIES FOR COMPONENTS DELIVERED PURSUANT TO PURCHASE ORDER 4502815356

22.   KEG incorporates Paragraphs 1-21 as if restated here.

23.   A true and accurate copy of KEG Purchase Order 4502815356 is attached as **Exhibit 3**.

24.   DCI warranted to KEG that the components delivered pursuant to Purchase Order 4502815356 were manufactured by Infineon.

25.   DCI further warranted to KEG that the components delivered pursuant to Purchase Order 4502815356 were merchantable, free from all defects in design, workmanship and materials, and would be fit for the particular purposes for which they are intended, and that the products were provided in strict accordance with the specifications and/or to samples, drawings, designs or other requirements (including performance specifications) supplied.

26.   DCI also warranted to KEG that all products delivered pursuant to Purchase Order 4502815356 would conform to the requirements of the Quality Manual.

27.   DCI supplied nonconforming components, in breach of its warranties.

28.   KEG has been damaged as a result of DCI's breaches of warranties.

WHEREFORE, KEG respectfully requests that judgment be entered in its favor and against DCI on Count 2 of the Complaint in an amount to be proven, and that KEG also be awarded interest, attorneys' fees, expenses and costs of collection, and all other just and proper relief.

## COUNT 3: BREACH OF WARRANTIES FOR COMPONENTS DELIVERED PURSUANT TO PURCHASE ORDER 4502839837

29.   KEG incorporates Paragraphs 1-28 as if restated here.

30.   A true and accurate copy of KEG Purchase Order 4502839837 is attached as **Exhibit 4**.

31.    DCI warranted to KEG that the components delivered pursuant to Purchase Order 4502839837 were manufactured by STMicroelectronics.

32.    DCI further warranted to KEG that the components delivered pursuant to Purchase Order 4502839837 were merchantable, free from all defects in design, workmanship and materials, and would be fit for the particular purposes for which they are intended, and that the products were provided in strict accordance with the specifications and/or to samples, drawings, designs or other requirements (including performance specifications) supplied.

33.    DCI also warranted to KEG that all products delivered pursuant to Purchase Order 4502839837 would conform to the requirements of the Quality Manual.

34.    DCI supplied nonconforming components, in breach of its warranties.

35.    KEG has been damaged as a result of DCI's breaches of warranties.

WHEREFORE, KEG respectfully requests that judgment be entered in its favor and against DCI on Count 3 of the Complaint in an amount to be proven, and that KEG also be awarded interest, attorneys' fees, expenses and costs of collection, and all other just and proper relief.

## COUNT 4: FRAUD

36.    KEG incorporates Paragraphs 1-35 as if restated here.

37.    Because KEG's agreements with DCI were for the sale of goods, DCI owed KEG a duty of good faith and fair dealing.

38.   DCI also possessed superior knowledge regarding the condition and origin of the components it supplied to KEG.

39.   DCI knew that components it supplied to KEG were not as it warranted but were in fact either used or counterfeit goods that did not meet the required specifications and were therefore unusable.

40.   KEG reasonably relied on DCI's representations that the components would meet required specifications and be delivered as warranted, as well as DCI's silence when DCI was under a duty to speak.

41.   KEG has been injured by DCI's misrepresentations and failure to disclose that components it supplied were used and/or of a counterfeit nature.

42.   DCI has gained an advantage, in the form of payment for the components, at KEG's expense.

43.   DCI's conduct constitutes fraud as defined by Indiana Code section 35-43-5-4, entitling KEG to the enhanced damages set out in Indiana Code section 34-24-3-1, the Indiana Crime Victim Relief Act.

WHEREFORE, KEG respectfully requests that judgment be entered in its favor and against DCI on Count 4 of the Complaint in an amount to be proven, and that KEG also be awarded treble damages, interest, attorneys' fees, expenses and costs of collection, and all other just and proper relief.

Respectfully submitted,

/s/ Andrew W. Hull
Andrew W. Hull (11218-49)
awhull@hooverhullturner.com
Michael R. Limrick (23047-49)
mlimrick@hooverhullturner.com
Evan D. Carr (33977-49)
ecarr@hooverhullturner.com
Hoover Hull Turner LLP
111 Monument Circle, Suite 4400
Indianapolis, IN 46204
Phone: (317) 822-4400
Fax: (317) 822-0234

Elisabeth Luff (29351-63)
elisabeth.luff@kimballelectronics.com
Kimball Electronics Group, LLC
1205 Kimball Blvd.
Jasper, IN 47546
Phone: (812) 634-4354

*Counsel for Plaintiff,*
*Kimball Electronics Group, LLC*

Case 3:23-cv-00139-RLY-CSW   Document 1-1   Filed 07/24/23   Page 10 of 56 PageID #: 17

39C01-2307-PL-000428
Dubois Circuit Court

Filed: 7/26/2023 10:35 AM
Clerk
Dubois County, Indiana

**Kimball Electronics, Inc.**
Global Supplier Quality Manual





EXHIBIT
1

**Kimball Electronics, Inc.**
Global Supplier Quality Manual

# Table of Contents

Introduction: Kimball Electronics' Vision and Guiding Principles about Kimball Electronics.

**1.0    Purpose and Function of This Manual: Vision, Purpose and Scope**
**2.0    Foundation of Core Requirements**
    2.1      General
    2.2      Basic Quality/Delivery Expectations
    2.3      Document Hierarchy
    2.4      Supplier Approval of Manual
    2.5      Quality System Requirements
    2.6      Change in Supplier Quality System Status
    2.7      Documentation Language Requirements
    2.8      Conditions of Purchase
    2.9      Record Retention Requirements
    2.10    Sub-Supplier Management
**3.0    Supplier Manufacturing Change Request (SMCR)**
    3.1      General SMCR Process Requirements
    3.2      Submission Expectations
    3.3      Shipping Material Requiring SMCR Sign off
**4.0    Corrective Action (CA) & Failure Analysis (FA) Requirements**
    4.1      Failure Analysis Requirements
    4.2      Corrective Action
    4.3      Corrective Action Requirements
**5.0    Handling of Non-Conforming Material**
    5.1      General Requirements
**6.0    Notification of Possible Quality Spills**
    6.1      General Requirements
**7.0    Certificate Requirements and Traceability**
    7.1      General Requirements
    7.2      Certificate of Compliance Components
    7.3      Certificate of Analysis Components
    7.4      Traceability
**8.0    Management of KE Tooling**
    8.1      General Requirements
    8.2      Tracking of Tools at the supplier's Site
    8.3      Changing of a KE Tool Status
**9.0    Reliability**
    9.1      General Requirements
    9.2      Electrical Reliability
    9.3      Mechanical Reliability
**10.0   Supplier Rating/Supplier Score Card**
    10.1    Supplier Performance
**11.0   Second Party Audits**
    11.1    Supplier Audit
    11.2    Right of Access Requirements
**12.0   Social Responsibility, Workplace Cleanliness and Safety**
    12.1    General Requirements
    12.2    Conflict Minerals Compliance
    12.3    Anti-Corruption
    12.4    Human Rights
    12.5    Code of Conduct

**Kimball Electronics, Inc.**
Global Supplier Quality Manual

**13.0   Packaging, Labeling and Handling**
    13.1   General Requirements
    13.2   Special Labeling of Shipments
    13.3   Electro Static Discharge (ESD) Requirements
    13.4   Moisture Sensitive Device (MSD) Requirements
**14.0   Component Approval Process**
    14.1   General Requirements
**15.0   Designation and Control of Special Characteristics**
    15.1   General Requirements
    15.2   Special Characteristic Process Capability
**16.0   Capacity Verification**
    16.1   General Requirements
    16.2   Capacity Summary
**17.0   Manufacturing Feasibility Statement**
    17.1   General Requirements
    17.2   Manufacturing Feasibility Submission
**18.0   Supplier Deviation Request (SDR)**
    18.1   General
    18.2   Submitting the SDR Form
    18.3   Shipping Material Requiring SDR Sign Off
**19.0   Environmental and Product Safety**
    19.1   General
    19.2   Reporting Requirements
    19.3    Product Safety
**20.0   Material Age**
    20.1   General Requirements
    20.2   Specific Requirements
**21.0   Safe Launch Requirements**
    21.1   General Requirements
    21.2   Submission and Reporting Requirements
**22.0   Controlled Shipment Requirements**
    22.1   General Requirements
    22.2   Control Shipment Level 1 (CS 1)
    22.3   Control Shipment Level 2 (CS 2)
    22.4   Control Shipment Level 3 (CS 3)
**23.0   Franchised Distributors**
    23.1   General Requirements
**24.0   Independent Distributors/Brokers Requirements**
    24.1   General Requirements
**25.0   Counterfeit Part Mitigation**

**Kimball Electronics, Inc.**
Global Supplier Quality Manual

## Introduction

**About Kimball Electronics, Inc.:**

Kimball Electronics, Inc. ("Kimball Electronics" or "KE") is a leading technology company providing design and engineering services, manufacturing, packaging, and distribution of electronic assemblies to a variety of industries on a global scale. Kimball Electronics is a contract manufacturer of durable goods. We continue to make the customer the focus of everything we do and will continue to provide the highest industry quality through continuous improvement.

Supplier development, high quality and reduced costs are some of our customers' primary concerns. By measuring our suppliers' performance in the three key areas of quality, delivery and service, we are able to help our customers remain competitive in the world market. For more information about KE, visit our internet web site at https://www.kimballelectronics.com/ .

## 1.0   Purpose and Function of This Manual

**Vision** – Kimball Electronics' goal is to develop a working relationship with our suppliers, mirroring the Vision and Guiding Principles on which KE's business philosophy is founded. The cornerstone to this relationship is aligning our expectations to ensure that our suppliers understand that they are a key part of our commitment to provide quality products that exceed our customers' expectations.

**Purpose** - The Global Supplier Quality Manual ("GSQM" or "manual") specifies Kimball Electronics' quality management system requirements and outlines the minimum acceptance conditions for the areas addressed within the manual. Additional requirements will be communicated on a case-by-case basis and/or will be addressed in other business-related documents. See Section 2.3 Document Hierarchy.

**Scope** - This GSQM only applies to product that is being supplied to Kimball Electronics. Any supplier process that does not relate to material or outsources being provided to Kimball Electronics is outside the scope of this manual.

## 2.0   Foundation of Core Requirements

### 2.1   General

(a) It is the expectation that the supplier follows the latest revision of the GSQM. For the latest revision and revision verification, refer to Global Supplier Quality Manual at https://www.kimballelectronics.com/docs/default-source/gsqm/keg_global_supplier_quality_manual.pdf?sfvrsn=84a11e88_10 All prior documented agreements remain valid until the newest revision of this manual is reviewed and acceptance of said manual is established.

(b) This manual was developed using the fundamental guidelines established in the International Organization for Standardization (ISO) Standards, such as ISO 9001, IATF 16949 and ISO 13485.

**Suppliers shall pass all KE's requirements in this manual to their subcontract manufactures providing materials that roll-up into a product sold to KE for their awareness of KE's customers' expectations.**

Automotive suppliers shall maintain compliance to governmental and regulatory requirements in the country of receipt, country of shipment, and if provided, the customer-identified county of destination.

### 2.2   Basic Quality/Delivery Expectations

(a) KE expects all suppliers to strive to reach a 0 PPM/0 Defect Occurrence and 100% On-time Delivery Standard and be registered in the appropriate Quality System standard. All suppliers not meeting these standards are expected to have action plans in line with the guidelines in Section 4, which may be requested by

**Kimball Electronics, Inc.**
Global Supplier Quality Manual

KE, to work toward these goals.  Suppliers failing to show improving trends may be placed on probation and ultimately, unapproved.  KE recommends the use of the 6 Sigma tool set, Lean practices, and 5S methods.

## 2.3   Document Hierarchy

(a) This manual defines the minimum requirements in conjunction with purchase orders, drawings and specifications.  In the event of conflicting interpretations, the following order of precedence applies:

    1)    Purchase Order
    2)    KE Specification or Drawing
    3)    Reference Documents/Signed Agreements/Data Sheets
    4)    This manual

Note: No verbal or unsigned documents supersede the requirements in this manual.

## 2.4   Supplier Approval of Manual

(a) The supplier shall review the entire manual and forward a signed copy of the KE Global Supplier Quality Manual (GSQM) Acceptance form to their KE contact.

(b) If the supplier takes exception to any section or element of this manual, the supplier shall provide detailed reasoning for each exception on the Exception List table at the end of this document.

(c) It is KE's intent to limit the amount of exceptions; thus, all exceptions will be reviewed and negotiated by the appropriate KE personnel. Approval by the KE personnel at a location will be required before the exceptions shall be valid at each KE location utilizing the supplier.

## 2.5   Quality System Requirements

| Supplier Type | Industry Type | Minimum Requirement | Development Goal |
|---|---|---|---|
| Component Manufacturers | Automotive | ISO 9001 | IATF 16949 ISO 14001 |
| | Medical | ISO 9001 | ISO 13485 ISO 14001 |
| | Public Safety (Defense) | ISO 9001 | AS 9100 ISO 14001 |
| | Industrial and Public Safety (Non Military) | ISO 9001 | ISO 14001 |
| Distributors / Brokers | All | ISO 9001 | ISO 14001/ AS6081 and AS5553 |
| Outsources (impact quality of product) | All | ISO 9001 | ISO 14001 |

(a) All suppliers must be registered to the minimum requirement.  All registrations must be obtained through a fully-accredited registrar.  It is KE's expectation that our suppliers will strive to be compliant with the Development Goal for the industry type of the components being supplied as outlined in the matrix above and in addition for automotive suppliers, the ultimate objective is to become certified to IATF 16949.  All references to the standards above are to the most current revision level.

(b) In addition to the above registrations, KE's customers may have product-specific requirements which shall be communicated separately.

(c) Suppliers providing custom materials for use in United States defense articles must have a valid license in compliance with the International Traffic in Arms Regulations (ITAR) 22 CFR 120-130 prior to providing ITAR products.

(d) Suppliers not registered to the most current revision of ISO 9001, but who are able to show compliance, will need to obtain a waiver from KE for the ISO 9001 minimum requirement prior to supplying product to KE.

(e) The waiver shall cover a limited timeframe, typically one (1) calendar year, unless a timing plan is included, in which case, the timeframe will be established per the plan.

**Kimball Electronics, Inc.**
Global Supplier Quality Manual

(f) Upon expiration of the waiver, the supplier must either show certification to ISO 9001 or have obtained a new waiver from KE.
(g) Request for the waiver for the life of a specific program must be obtained from the KE facility affected.

### 2.6    Change in Supplier Quality System Status

(a) In the event the supplier's Quality System registration status changes, the supplier must notify the KE contact from **_ALL_** KE manufacturing sites that they supply product to within five (5) business days of the status change.
(b) A change consists of any action by either the supplier or the supplier's registrar that limits or alters the condition or duration of the supplier's registration.
(c) This includes conditions such as renewal, upgrade, suspension, probation, expiration and termination.
(d) In such cases where the lapse in registration causes the supplier to fail to meet the Minimum Requirements as stated in section 2.5 Quality System Requirements, the supplier must provide documentation as to why the registration status changed and make themselves available for an audit by KE representatives to verify compliance to the minimum requirements.

### 2.7    Documentation Language Requirements

(a) In order to maintain documentation that is readily transferable and understood between different KE sites, all documentation relating to Quality and Business activities shall be provided to the KE site in English.   The KE site requesting the documentation may waive this requirement.

### 2.8    Conditions of Purchase

(a) Acceptance of the purchasing documentation or the shipment of products constitutes acceptance of ALL REQUIREMENTS detailed within the purchasing documents. Suppliers shall meet all Conditions of Purchase, including KE's standard Terms and Conditions, unless a superseding contract signed between the supplier and KE, which provides different terms and conditions of purchase, exists.  In which case, the contract will define the primary rules and conditions of precedence or may add the new requirements to existing Terms and Conditions.
(b) If the supplier is unable to meet these conditions, the KE contact for that purchase document must be notified in writing prior to acceptance of the order.  The Conditions of Purchase will apply to each Purchase Order released by KE.
(c) Failure to comply with the purchase requirements can result in the rejection of the received material.
(d) ~~Additionally, the supplier must be compliant to the business and shipping requirements documented in the KE "Routing Instruction Guideline Summary".~~
(e) ~~Suppliers must review the KE **"Routing Instruction Guideline Summary"** and sign and submit the acknowledgement document included in the guide.~~
(f) ~~The guide is located on the KE website.~~
~~http://www.kimballelectronics.com/home/kegroup/GSQM/KEG_Routing_Instructions.pdf~~

### 2.9    Record Retention Requirements

(a) Quality records shall be maintained in a manner so they remain legible and retrievable upon request.
Record retention requirements must be according to industry standards or legal requirements.
(b) Additionally, KE's customer may have specific record retention requirements which shall be communicated separately.  Industry standards are included below.
- **Automotive** programs shall be maintained for a period of the program life plus fifteen (15) years.
- **Medical** programs shall be maintained for a period of the device life plus one (1) year, with a minimum of two (2) years.
- **Industrial, Public Safety** and other non-specified industries shall be maintained for a period of five (5) years or industry standards retention timeframes, whichever is longer.

(c) If the supplier is uncertain of the industry in which their material will be used, they should contact their KE Contact for clarification/confirmation.
(d) The supplier shall not dispose of records prior to the period defined in section 2.9.b.
(e) For components provided to multiple industries, the longer of the retention requirements apply.

**Kimball Electronics, Inc.**
Global Supplier Quality Manual

(f) The supplier shall retain a sample of all returned materials/assemblies for a minimum of a two (2) year period to highlight problem areas and trends in the manufacturing process. Samples may also be utilized for further investigation of repeated issues.

### 2.10   Sub-Supplier Management

(a) KE expects our supplier to maintain responsibility for their suppliers and provide direction and leadership to their supply base consistent with KE's requirements, including flow-down of necessary regulations.

(b) The supplier shall have a process in place to ensure their suppliers' ability to provide defect-free material per their delivery requirements.

(c) The supplier shall oversee the timely response to quality concerns with limited input from KE.  As needed, KE will be available to assist with such concerns.

### 3.0   Supplier Manufacturing Change Request (SMCR)

#### 3.1   General SMCR Process Requirements

(a) Any change(s) that either alters/changes the process flow or has any impact on either the design condition or Form, Fit, and/or Function and or change in appearance of a supplied component must be properly documented on a Supplier Manufacturing Change Request (SMCR) form and be submitted to the KE Contact(s) from the KE facilities affected for review/approval no later than three (3) months prior to implementation of the change. Exceptions to the three (3) months requirement shall be on a case-by-case basis.

For end of life components, a minimum notice of six (6) months is required to allow for final orders to be placed and twelve (12) months is required from the notice for the final shipment.

(b) ALL changes must be formally approved in writing by the affected KE manufacturing sites prior to the implementation of said change.

(c) The supplier shall be liable for costs associated with unapproved changes which may include, but are not limited to, any combination of the following conditions: rework, sort, replacement, KE line down time, KE customer line down time, express shipments, validation, KE personnel support/labor costs, scrap induced by the unapproved material, potential recall of goods from KE customers.

(d) Submission and the subsequent approval of an SMCR do not constitute authorization for a supplier to ship the "changed" material.  All changes are subject to potential Component Approval documentation, i.e. PPAP, FAI, etc. requirements.  See Section 14.

(e) Component Approval documentation requirements will be noted on the approved copy of the SMCR document.

(f) Approval at one KE site does not indicate approval by all sites.  Approvals will vary based on customer requirements. Shipment of changed material shall only be made to the KE sites that have given final approval of the SMCR.

(g) No Process or Design changes will be allowed on any KE program without proper justification, objective evidence and documented approval.

(h) All SMCR's submitted will be reviewed for validity but may be placed in a HOLD status until the end of the ninety (90) day moratorium at a minimum.  Based on the nature of the change, the HOLD status may be up to a maximum of 180 days or need addressed on a case-by-case basis.

(i)  The most recent revisions of the KE SMCR form and instructions are available from the KE Contact.

#### 3.2   Submission Expectations

(a) The supplier shall provide KE with a detailed description of the proposed change(s), including as needed, testing and/or dimensional data appropriate for the change being submitted.  The required data will be consistent with any previously submitted DVP&R (Design Verification Plan and Report) requirements for the initial validation of the component.

(b) When data/testing cannot be accomplished without the implementation of the change, a detailed plan explaining the data that will be provided post-change shall accompany the SCMR.

(c) Any additional requirements shall be communicated to supplier.  Such additional requirements shall be provided before approval shall be granted.

(d) In the instance of a non-reversible change, additional information covering the transition plan with timing, buffer stock planning/quantity (to ensure continuity of supply), and contingency plans are expected to be submitted with the SMCR.  The SMCR must clearly state that the change is "NON-Reversible once

**Kimball Electronics, Inc.**
Global Supplier Quality Manual

implemented" within the description of the change.  Provisional approval may be given to proceed with a non-reversible change; however, additional requirements may be required.

### 3.3    Shipping Material Requiring SMCR Sign off
(a) No material subject to a SMCR can be shipped until the supplier has been notified, in writing, of the approval of the SMCR.
(b) The supplier shall provide the Date Code and/or Lot Number of the initial production run and shipping tracking number prior to supplying changed material.
(c) The initial shipment under an approved SMCR must consist of 100% post-change material, and the packing documents shall include the SMCR number.
(d) Once the initial shipment of product under an approved SMCR has been made, no material made prior to the change can be shipped to KE without written approval from the KE site(s) that has approved the SMCR.
(e) If pre-change material is received after the initial shipment of the changed material without the approval of the KE facility, the material may be considered non-conforming material and be handled according to section 5.0 Handling of Non-Conforming Material.

## 4.0    Corrective Action (CA) & Failure Analysis (FA) Requirements
### 4.1    Failure Analysis Requirements
(a) The supplier shall have a documented system for Failure Analysis compliant to the format appropriate to the industry.
(b) The supplier shall perform Failure Analysis on units returned by any KE facility and provided by request. When Failure Analysis is requested by a KE site, the Failure Analysis report shall be submitted within the timeframe indicated on the request.
(c) The Failure Analysis timeframe requirements shall be specific to the failure and determined by KE in its sole discretion.  However, an initial response is due within 24 hours of receipt of the request for a response, but may be reduced based on customer requirements.
Missing the required timeframe for the Failure Analysis will result in an immediate reduction of the supplier's rating.
(d) If the supplier's FA report or other FA activities determine the issue to be supplier caused, KE can request a formal corrective action.  Such request may include the format of the corrective action.
Supplier will regularly update KE on the progress of the FA.

### 4.2    Corrective Action
(a) When a Corrective Action is requested, KE prefers the method of documenting this process to follow the standard 8-Steps discipline (8D).  Exceptions to the 8D format shall be provided on a case-by-case basis.
(b) The 8D method consists of identification of team members, detailed description of the problem, containment action, detailed root-cause analysis and reason the defect was not contained, interim corrective action(s), permanent corrective action(s) with statistical verification, steps taken to prevent reoccurrence, and congratulations to the team members.
(c) Suppliers that already have 8D formats within their Corrective Action / Preventive Action system will be allowed to use these at the discretion of the KE facility requesting action.  As KE has different business segments and different requirements, consult with your KE Contact to ensure your format is acceptable.  A template will be provided by the KE Contact, if requested.

### 4.3    Corrective Action Requirements
(a) The corrective action plan shall be submitted to the KE site contact requesting the corrective action within the timeframe indicated on the request for corrective action.
(b) The supplier must notify KE if the request is not sufficient for their corrective action activities and request clarification or additional information within 24 hours of receipt of the initial notification.
"Observational" issues addressed by Quality Notification do not require a full or formal 8D but do require the supplier review the issue/defect and determine if a CA is necessary and provide the affected KE facility with the results of the analysis and a description of CA if one is implemented. For repeated issues initially addressed by Quality Notification, full formal Corrective Action will be required.

**Kimball Electronics, Inc.**
Global Supplier Quality Manual

(c) In situations where the proposed corrective action will require a change to the manufacturing process or component design, a SMCR will be required

(d) The SMCR is to reference the CA number within the "Reason for Change" section.

Periodic and timely progress updates shall be provided to the KE facility requesting the CA.

Notification of approval from the KE manufacturing site requesting the corrective action shall be given upon satisfactory completion of the corrective action.

## 5.0 Handling of Non-Conforming Material
### 5.1 General Requirements

(a) For each supplier complaint, KE may generate an administrative fee for handling non-conforming material.

(b) The KE Contact will work with the supplier to determine the appropriate actions for handling suspect material.

(c) These actions may include, but are not limited to, any of the following actions:

- Provide Priority Material to replace the non-conforming material
- Authorize return of the suspect material to the supplier for sorting
- Providing resources to sort the suspect material
- Paying for the KE site to sort the suspect material
- Scrap of the non-conforming material at the KE facility, at supplier cost

(d) When it is determined by KE that the defect is the fault of the supplier, the supplier will be subject to actions regarding any costs incurred by the KE facility as found on the Purchase Order Terms and Conditions, resulting from the non-conforming material. Such costs may include but are not limited to a) cost of raw product, b) transportation costs, c) product recall costs, d) Direct labor and material costs incurred by KE prior to the discovery of the nonconformity, and e) other costs.

## 6.0 Notification of Possible Quality Spills
### 6.1 General Requirements

(a) In the event the supplier discovers or suspects the shipment of non-conforming material, the supplier shall notify **ALL** applicable KE facilities subject to receiving the suspect material.

(b) These notifications must be sent to the Purchasing Contact Persons for ALL applicable facilities that have exposure to the quality spill.

(c) The notification must include a detailed definition of the suspect/non-conforming condition as well as information concerning the number of suspect parts, date codes, lot numbers and any unique identifiers that identify the suspect units.

(d) The supplier shall provide a plan for handling of non-conforming material and initiate an 8D corrective action plan to address the non-conforming issue. Reference Section 5.0 Handling of Non-Conforming Material. (*See* Section 4.4)

## 7.0 Certificate Requirements and Traceability
### 7.1 General Requirements

(a) When a Certificate of Analysis (C of A) or Certificate of Compliance (C of C) is specified either in the purchase order or the applicable specifications/drawings, the supplier shall provide a valid certificate with each shipment certifying that the material meets all contract requirements.

(b) Acceptance of material based on a supplier certificate does not exclude KE from subsequent rejection due to any nonconforming attribute or characteristic.

(c) Results of tests must be actual data that represents the lot of material shipped.

(d) Failure to supply the certificate when required is potential grounds for rejection of the shipment.

(e) The supplier shall provide C of A or C of C for any outsourced process (Painting, Metal plating, Machining, etc.).

### 7.2 Certificate of Compliance Components

To be considered valid, a C of C shall include as a minimum:

- Lot Number and/or Date Code
- Date of shipment

**Kimball Electronics, Inc.**
Global Supplier Quality Manual

- KE PO number
- Quantity shipped
- KE part number specified
- Supplier's authorized signature, certifying compliance to requirements
- Indication of material UL compliance, when applicable
- Compliance to specific requirements (UL, RoHS, etc.)
- Additional requirements may exist for individual KE sites and program team.

### 7.3    Certificate of Analysis Components
(a) To be considered valid, a C of A shall include all the components of a C of C plus the results of any tests ran on the lot/lots of material shipped.
(b) The specific test data required shall be noted in either the Purchase Order or on the product print/specification sheet.

### 7.4    Traceability
(a) Supplier shall provide all necessary documentation, numbering (ie date codes, lot codes, AMPL, nomenclature, etc.) to inform KE of a product's pedigree.
(b) Supplier shall cooperate with KE's Traceability process including, but not limited to, suspect product investigation.

## 8.0    Management of KE Tooling
### 8.1    General Requirements
(a) Unless provided with markings or tagging, supplier shall permanently mark or tag tooling items provided by KE to preserve ownership visibility.
(b) The supplier is responsible and liable for the tooling item immediately upon receipt.  This includes cleanliness, preventive maintenance, storage and handling of the tool.
(c) All tooling, KE owned or KE's customer owned, used by supplier will be subject to contractual terms & conditions to determine replacement responsibility. Tool life and normal wear and tear conditions shall be considered.

### 8.2    Tracking of Tools at the Supplier's Site
The supplier shall maintain the following information on KE / KE customer-owned tools:
- Tool or tool order number
- Description of the tool
- Receiver or owner of the tool
- List of KE customer-owned tools
- List of KE-owned tools
- Location of tool in house
- Evidence of the permanent marking on each tool

### 8.3    Changing of a KE Tool Status
(a) The KE Contact shall be immediately notified of any change to the functionality of the tool or any issue that might affect quality or delivery of product produced.  KE and suppliers will follow specific customer request to report tooling condition and status.
(b) Modifications and change of location shall require the submission and subsequent approval of an SMCR prior to the initiation of the change. (See Section 3.0 Supplier Manufacturing Change Request.)
(c) The supplier shall obtain written approval prior to scrapping any KE-provided tool.

## 9.0    Reliability
### 9.1    General Requirements
(a) The supplier shall have or have access to a reliability program, per industrial standards, to support product that they are supplying to any KE facility.

**Kimball Electronics, Inc.**
Global Supplier Quality Manual

(b) The reliability levels of the supplier's product shall be measured in industry terms.
(c) The reliability level of a supplier's product and the test methods used to determine those levels shall be consistent with industry standards and be identified as such.

**9.2    ~~Electrical Reliability~~**
~~(a) When appropriate, new components and/or components subject to changes under a KE-approved SMCR shall undergo Industry-recognized qualification testing, i.e. Automotive Electronics Council (AEC) Q test standards where applicable, unless waived by KE in writing.~~
~~(b) It is the supplier's responsibility to develop and initiate a testing plan compliant to the applicable Industry-recognized qualification testing, i.e. AEC requirements.~~
~~(c) It is the supplier's responsibility to document the equivalence of an alternate standard. The documentation shall consist of a line-item-by-line-item analysis of both testing standards.~~
~~(d) Other requirements may be needed depending on the application of the device.  The applicable KE facility will communicate additional requirements during the time of the quote or during the change process.~~

**9.3    ~~Mechanical Reliability~~**
~~(a) Mechanical components shall not change in form, fit, or function when exposed to the manufacturing and application environment of the device.~~
~~(b) Suppliers shall clearly identify any manufacturing or application limitations of their devices.~~
~~(c) Testing requirements will be per either the DVP&R (Design Verification Plan and Report) requirements or applicable specifications.~~

## 10.0  Supplier Rating/Supplier Score Card
**10.1  Supplier Performance**
(a) The supplier's performance will be continually evaluated by all KE facilities receiving product from the supplier, with emphasis on the following:
- Quality
- On-time delivery
- Customer service

(b) Additional consideration will be given to KE customer complaints, reliability, failure to adhere to processes, compliance to quote, failure to meet specifications among other factors unique to the supplier, customer and industry.
(c) The supplier shall define, document and implement systems that support a product nonconformance parts ~~per million (PPM)~~ and on-time delivery performance ratings.
(d) ~~When PPM~~ and/or on-time delivery expectations are not met, the supplier may be asked to implement internal corrective actions or issued a SCAR to address the deficiencies.

## 11.0  Second Party Audits
**11.1  Supplier Audit**
(a)  A supplier audit may be conducted by KE representatives and KE's customers, at the supplier's site(s), at any time with reasonable notice.  The purpose of the audit is to verify that the supplier has the appropriate resources to produce a component that can meet both the quality and delivery targets stated in this manual.
(b) Action items or recommendations may be generated as a result of any audit activity.
(c) The supplier's commitment to correction of the deficiencies identified during the audit will be a factor in determining overall acceptability of the supplier.
(d) Once corrections are made, a follow-up audit may be scheduled to confirm the completion of the actions.
**11.2  Right of Access Requirements**
(a)  When appropriate (for example AS9100, FDA, etc.), KE, customers of KE and regulatory authorities require the right of access to the supplier.  This includes the applicable areas of all facilities, at any level of the supply chain, that are involved in the order and access to all applicable records.
(b) Right of access will be requested by KE to the supplier with as much advanced notification as is practical, based on the circumstances.

**Kimball Electronics, Inc.**
Global Supplier Quality Manual

## 12.0  Social Responsibility, Workplace Cleanliness and Safety
### 12.1  General Requirements
(a) Plant cleanliness and working conditions are to be conducive to ~~manufacturing a~~ quality product and providing for quality improvement.  5S or general cleanliness activities are highly recommended.

(b) Preventive maintenance and cleaning schedules shall be established for the production, inspection, and testing areas ~~producing material for a KE facility.  Such schedules are to be rigorously followed and objective evidence maintained.~~

(c) The supplier shall have a process to ensure compliance with all applicable government, safety and environmental regulations, including those concerning handling, recycling, eliminating or disposing of hazardous materials.  Evidence of compliance shall be provided by the appropriate certificates or letters.

(d) The supplier shall monitor injury and accident rates and take actions, appropriate for ~~their manufacturing~~ operations and locations, to protect all their employees.

### 12.2  Conflict Minerals Compliance
(a) Supplier shall comply with KE's Conflict Mineral reporting obligations.
https://www.kimballelectronics.com/supply-chain/conflict-minerals-policy

### 12.3  Anti-Corruption
(a) Supplier shall work against corruption in all its forms, including extortion and bribery.

### 12.4  Human Rights
(a) Supplier shall:

- No Discrimination: Promote and assure equal opportunities for and treatment of its employees irrespective of skin color, race, nationality, social background, disabilities, sexual orientation, political, religious or other beliefs, language, caste, property, birth or other status, gender or age.
- Respect Employee Rights: Ensure respect of the personal dignity, privacy, and rights of each individual working for the company.
- No Harassment or Discrimination:  Prohibit unfair treatment of employees, such as mental cruelty, sexual harassment, or discrimination in hiring, like, but not limited to, compensation, access to training, promotions, termination and other items within ILO Convention No. 111.  Supplier shall prohibit behavior including gestures, language and physical contact, that is sexual, coercive, threatening, abusive, or exploitative in nature.
- Provide Fair Wage:  the applicable national statutory minimum wage must be met.
- US Federal Acquisition Regulations (FARs) and Defense Federal Acquisition Regulation (DFARs): For some contracts, KE shall inform supplier of additional regulations which are statutorily imposed on all contractors and subcontractors.  These may be found on the relevant PO or in correspondence from KE.  Fulfilling a PO containing these additional regulations indicates acceptance by supplier of the added requirements.

### 12.5  Code of Conduct
Supplier shall establish a Code of Conduct that complies with KE's Code of Conduct, and understand how to report any actual or suspected misconduct related to ethical obligations.  KE's Code of Conduct and the process for reporting violations can be viewed from this link   https://www.kimballelectronics.com/code-of-conduct
To report violations of the KEI Code of Conduct use this link.   https://www.kimballelectronics.com/code-of-conduct/reporting-violations

## 13.0  Packaging, Labeling and Handling
### 13.1  General Requirements
(a) Product shall be appropriately packaged to protect it from damage.  All supplier-provided packaging shall meet applicable shipping laws, codes and regulations, ~~and must be qualified to International Safe Transit Association (ISTA) test standards, as applicable.~~

**Kimball Electronics, Inc.**
Global Supplier Quality Manual

(b) All shipments shall be packaged in an undamaged package which is free of dirt, debris, foreign materials and previous markings/labels.

(c) Packaging that does not meet these standards may be grounds for rejection of the material lot.

(d) Each shipment document shall contain as a minimum:

- KE P.O. number
- KE part number
- KE part description
- Manufacturer part number
- Manufacturer name
- Date Code (Multiple date codes for reeled components are **NOT** allowed to be packaged on one reel)
- Engineering change/revision level
- Quantity
- Lot Code
- Number of boxes (in the shipment)
- KE site name, and address
- Shipment identification number (Delivery note number)

Following pieces of information are to be barcoded – using 2D barcoding standards is recommended (QR Code – preferred, Data Matrix, PDF417):

- KE PO number
- KE Part number
- Manufacturer part number
- Lot code
- Date code
- Quantity
- Shipment Identification number (Delivery note number)

(e) Each single box/reel is to contain identification label with the following identification as minimum:

- Manufacturer part number
- Manufacturer name
- Lot code
- Date code
- Quantity in the box/on the reel

Following data is to be barcoded – using 2D barcoding standards is recommended (QR Code – preferred, Data Matrix, PDF417):

- Manufacturer part number
- Lot Code
- Date Code
- Quantity in box / on the reel

(f) Following data field identifiers are to be used in the barcode and the human readable formats:

| Data field | Field identifier |
|---|---|
| KE PO number | K |
| KE part number | P |
| Manufacturer part number | 1P |
| Manufacturer name | 18V |
| Quantity | Q |
| Lot code | 1T |

**Kimball Electronics, Inc.**
Global Supplier Quality Manual

- ~~Date code~~                                    ~~9D~~
- ~~Delivery note number~~                         ~~N~~

~~(g) In addition to field identifiers described in 13.1.f, each barcode is to contain a field separator to isolate single piece of information on the data stream.~~

(h) As applicable, additional information shall be provided on the relevant shipment documents:
- Country of Origin
- RoHS conformance level
- REACH information
- Battery information
- Harmonized Tariff Schedule (HTS) number
- Export Control Classification Number (ECCN)

(i) Additional markings that are required when applicable for the component type:
- Component value
- Component tolerance
(j) Packing slips shall be attached to the carton exterior in shipping envelopes.

## 13.2   Special Labeling of Shipments
(a) The initial shipment of product shipped under an approved SMCR, PPAP, EC, control ship, or deviation must be labeled as indicated.
(b) Any unique tracking number supplied by the KE site to the supplier shall be placed on the material label, or attached to the material, in such manner that makes it clearly visible.
(c) A note shall also be added to the packing slip identifying the SMCR, EC, PPAP, deviation number, control ship, or KE tracking number, as well as the KE contact name.
(d) Product shipped after sorting or rework by the supplier shall be labeled as indicated.  The label shall state sorting or rework performed and date performed.

## 13.3   Electro Static Discharge (ESD) Requirements
(a) ESD packaging shall be used for all static-sensitive products per industrial standards.   KE ESD Control Programs are based on ESD Association S20.20 or IEC 61340-5-1.
(b) The product's packaging shall be labeled as to the sensitivity of the device.
(c) Suppliers of static-sensitive components shall incorporate suitable measures, including protected areas, handling, and packaging requirements, to ensure that components are not damaged due to ESD events prior to arrival at a KE facility.
(d) These practices shall be documented in an ESD Control Program within the suppliers manufacturing facilities.
(e) Objective evidence is to be available demonstrating compliance.
(f) Suppliers shall notify KE in writing of any component designated as Class 0 <250V (HBM) or material that is susceptible to static charges <100V (HBM) per ESD Association STM5.1

## 13.4   Moisture Sensitive Device (MSD) Requirements
(a) The suppliers shall use the MSD packaging and labeling requirements for all moisture-sensitive devices per the latest revision of IPC/JEDEC J-STD-033 standards.
(b) The suppliers of MSD devices shall have a control program in place to guarantee conformance to MSD standards within the supplier's manufacturing facilities, and shall use the latest revision of IPC/JEDEC J-STD-020 to determine the sensitivity classification for non-hermetic solid-state surface mount devices.
(c) Objective evidence showing compliance shall be available for review if requested.
(d) MSD sensitive components shall be sealed in a moisture barrier bag containing desiccant and humidity indicator card, when appropriate.
(e) The bag shall be labeled indicating moisture sensitivity level, peak body temperature exposure, maximum exposure time before re-bake is required, and date the bag was sealed.
(f) Shelf life shall be a minimum of twelve (12) months.

**Kimball Electronics, Inc.**
Global Supplier Quality Manual

## 14.0  Component Approval Process

### 14.1  General Requirements

As KE has suppliers providing parts for multiple business segments, the following approach will be utilized. Initial process studies must be completed and the customer requirements for process capability must be met to achieve full qualification approval.

(a) **Automotive** suppliers must comply with all KE specific requirements in addition to the standard requirements listed within the Automotive Industry Action Group (AIAG) Production Part Approval Process (PPAP) manual - most recent revision, and shall maintain a PPAP Approved Status throughout the program life.

The layout inspection frequency is determined by the customer.

The results of the revalidation shall be documented and maintained at the supplier's site. This shall be available upon request.

Initial process studies must be completed for these, and the customer requirements for process capability must be meet to achieve full PPAP approval.

All KE suppliers are provided a package of appropriate requirements to use as a guideline for determining the appropriate submittals. The package is located on the KE website at

http://www.kimballelectronics.com/home/kegroup/GSQM/Component_Approval_Process_Requirements_Manual.doc

The KE plant SQE / SDE will review the component PPAP using the Component Approval Checklist.

A copy of the Component Approval Checklist is available on the KE website at

http://www.kimballelectronics.com/home/kegroup/GSQM/KEG_Component_Approval_Checklist.doc

(b) **Medical** suppliers shall comply with the ISO 13485 Standard as applicable, and/or the US FDA 21 CFR (Code of Federal Regulations) Part 820 Quality System Regulation applicable requirements shall be followed, i.e. Subpart E—Purchasing Controls.

(c) **Public Safety** (Defense) sector may be required to follow AS9100 first article checklist.

(d) **Industrial & Public Safety (Non-Military)** suppliers at a minimum shall provide first article inspection report or KE specific requirement.

## 15.0  Designation and Control of Special Characteristics

### 15.1  General Requirements

(a) The purpose of this section is to establish the requirements for control of special characteristics, (SC/Key/CC, Significant/Key/Critical Characteristic) if such have been designated both by KE and KE customer.

(b) Special characteristics are marked on the drawing by symbols like SC1, SC2, etc.

(c) Special characteristics may be marked originally, on the drawing, by KE customer. KE itself may also define some characteristics as special and they will also be marked on the drawing.

(d) Requirements for KE customer special characteristics are usually defined on the drawing. If not, supplier is obligated to meet requirements, defined in the table (15.2).

(e) Any concern regarding manufacturing feasibility or capability of meeting the special characteristics must be documented in the component Manufacturing Feasibility Statement (section 17 of this manual).

(f) Supplier is obligated to meet the requirements defined for special characteristics, and the results of the control shall be available per KE request (e.g. during component approval phase, during serial production, during KE audit at supplier plant).

(g) All statistical data must be representative of the entire production population and reflect how the parts will be received at the KE facilities.

(h) Where multiple product streams and/or cavities exist, the statistics used to describe the population must include all possible sources of product variability.

(i) The supplier may submit separate capability studies for each cavity to identify the capability of the individual cavities

(j) Special characteristic features that identify multiple features such as hole patterns, mounting bosses, and pin locations require a separate capability study for each unique condition.

**Kimball Electronics, Inc.**
Global Supplier Quality Manual

(k) This can be negotiated based on the number of studies required, and the supplier may request the number of required samples taken be reduced.

**Kimball Electronics, Inc.**
Global Supplier Quality Manual

## 15.2 Special Characteristic Process Capability

| Characteristic Level | Description | Basic Requirement | Frequency of control | Method of control |
|---|---|---|---|---|
| SC1 | **With Safety and/or Regulatory Requirements Consideration:** Product/ process/ test requirements or process parameters which can affect compliance with government regulations or safe/product function. | Cpk/ Cmk > 2.0 (short run/component approval phase)<br><br>Ppk > 1.67 (normal/standard production)<br><br>SPC as appropriate Poka Yoke or 100% automatic inspection | Hourly, unless otherwise specified in the Control Plan | Variable data SPC charts with control limits |
| SC2 | **Customer Satisfaction / Dissatisfaction Consideration:** Product/ process/ test requirements which are important to customer satisfaction. | Cpk/ Cmk > 1.67 (short run/component approval phase)<br><br>Ppk > 1.33 (normal/standard production)<br><br>SPC as appropriate Poka Yoke or 100% automatic inspection | Audit basis as specified in the Control Plan | Variable data SPC charts with control limits |
| SC3 | **Product Performance Consideration:** Features which have impact on performance or which being out of specification may result in difficulty during the assembly process. | Poka Yoke strongly recommended | Audit basis as specified in the Control Plan | Attribute data collection or Variable data SPC charts with control limits |
| Pass-Through Characteristic | Any characteristics that are important for fit, form or function for all processes and products | Need to be controlled. Should be managed with extra care over and above that used with standard characteristics. Potential Failure Mode and Effects Analysis (PFMEA) | Audit basis as specified in the Control Plan. | Attribute data collection or Variable data SPC charts with control limits. |

## 16.0 Capacity Verification
### 16.1 General Requirements
(a) The primary purpose of capacity verification is to determine/identify bottlenecks within the manufacturing process of customized components that could impact the supplier's ability meet KE's requirements. A copy of the KE Capacity Verification Form and instructions are available on the KE website at:
- KE Capacity Verification Form http://www.kimballelectronics.com/docs/default-source/gsqm/keg_capacity_verification_form.xls?sfvrsn=6
- KE Capacity Verification Instructions https://www.kimballelectronics.com/docs/default-source/gsqm/capacity_verification_form_instruction.pdf?sfvrsn=e2a11e88_4
(b) KE can request/require capacity studies be performed at any time during the program.

### 16.2 Capacity Summary
(a) If the Standard Annual Capacity for any of the process steps is less than the programs targeted Capacity Planning Verification, a corrective action plan showing actions to be taken to address the issue must be provided with the Capacity Verification documentation.
(b) Tooling Capacity Utilization or Machine Capacity Utilization for any process step that shows greater than 80% utilization must be reviewed and a detailed plan of action established to ensure the process is capable of meeting potential increases in demands in a timely manner.

## 17.0 Manufacturing Feasibility Statement
### 17.1 General Requirements
(a) The Manufacturing Feasibility Statement is a commitment by a supplier that the component can be manufactured in accordance with proposed design, while meeting all capability requirements, related specifications and shipped at a rate consistent with the production requirements.
(b) The feasibility analysis shall be based on a specific engineering change/revision level for the applicable drawings and/or specifications associated with the product.

**Kimball Electronics, Inc.**
Global Supplier Quality Manual

(c) Design changes/revisions will need to be reviewed independently.

## 17.2   Manufacturing Feasibility Submission

(a) The Manufacturing Feasibility Statement shall be submitted per KE request.

(b) Feasibility reviews shall be documented using the Manufacturing Feasibility Statement form is available on the KE website at:

http://www.kimballelectronics.com/docs/default-source/gsqm/manufacturing-feasibility-form.doc?sfvrsn=2

(c) Assessment of feasible with no exceptions noted indicates that the supplier can meet ALL of the requirements for the program.

(d) Assessment of Marginal or Not Feasible means that the supplier is not able to meet at least one of the program requirements. Exceptions shall be documented using the Manufacturing Feasibility Statement form.

(e) The supplier will use all applicable Advanced Quality Planning tools appropriate to demonstrate manufacturing feasibility.

(f) Corrective action plan(s) and/or suggestions for design/process changes to achieve the design requirements must be submitted with the exception list.

(g) The supplier is also expected to recommend changes that would improve the manufacturability or quality, eliminate potential failure modes, or reduce cost.

(h) It is KE's intent to limit the amount of exceptions; thus all exceptions will be reviewed and negotiated by the appropriate KE personnel.

(i) Approvals of the exceptions will be granted by the Program Management Representative (or delegate) and KE customer, if applicable.

(j) Failure by the supplier to identify and document feasibility concerns during the supplier selection process does not limit the supplier's legal and economic obligation to the program once awarded the business.

## 18.0   Supplier Deviation Request (SDR)

### ~~General~~

~~(a) Any shipment of supplied materials that knowingly does not meet specified quality standards must be properly documented on a Supplier Deviation Request (SDR) form and approved by authorized personnel at the KE site receiving the material prior to the shipment of said material.~~

~~(b) When unsure if an issue requires a SDR, the supplier shall contact the appropriate KE Contact.~~

~~(c) The KE Supplier Deviation Request (SDR) form is available upon request. Supplier Deviation Request (SDR) Instruction is available at:~~

~~http://www.kimballelectronics.com/home/kegroup/GSQM/Supplier_Deviation_Request-Instructions.doc~~

~~(d) Approval of the SDR will come in the form of the signed and dated SDR document being returned to the supplier, with the approval status clearly identified.~~

~~(e) SDR approval at one KE site does not indicate approval by all sites.~~

~~(f) Approval can/will vary based on KE's customer requirements and KE sites.~~

~~(g) It is the supplier's responsibility to ensure that the identified material is shipped only to the KE facility that has approved the SDR.~~

~~(h) Receipt of non-conforming material at a facility that has rejected a SDR or which is not accompanied by an approved SDR will be handled under the guidelines of section 5.0 Handling of Non-Conforming Material.~~

~~(i) Additionally, the supplier could be subject to corrective action measures and handling fees associated with the unauthorized shipment.~~

### ~~18.2   Submitting the SDR form~~

~~(a) The completed form shall be submitted to the appropriate KE Contact(s) at the affected KE facility receiving the deviating material.~~

~~(b) Additional requirements will be communicated to the supplier on an as needed basis.~~

~~(c) Qualification testing for some components may be required.   Refer to Section 9.0 Reliability for details regarding qualification testing that may be required.~~

~~(d) All requirements must be met before approval status can be determined.~~

~~(e) Failure to provide all required documentation can result in a rejection of the SDR.~~

**Kimball Electronics, Inc.**
Global Supplier Quality Manual

18.3    **Shipping Material requiring SDR Sign Off**
(a) All material shipped under an SDR shall be marked with the SDR number on the label, packing slip or attached in such a way that it is clearly visible and must be a shipment of 100% affected material.

## 19.0   Environmental and Product Safety
19.1    **General**
(a) Kimball Electronics is committed to doing business with environmentally responsible suppliers and requires its suppliers to comply with all applicable laws, regulations, orders, and policies in providing materials and services to KE.
(b) Supplier shall take necessary steps to minimize environmental pollution and make continuous improvements towards environmental protection.
(c) In furtherance of these goals, supplier shall:
- Make all reasonable efforts to promote compliance with industry-recognized social and environmental responsibility guidelines.
- Have initiatives to promote greater environmental responsibility with actions for continuous improvement. (Example:  Significant Environmental aspects with Annual Goals)
- Engage to investigate opportunities to reduce product's environmental impact to improve the quality of life in their communities and the world community.

 (d) In furtherance of these goals and as directed per purchase order, schedule order or schedule agreement of related documents like drawings and specification, supplier shall submit the requested compliance documents for such regulations as the Restriction of the Use of Certain Hazardous Substances (RoHS) Directive , The End-of-life Vehicle Directive (ELV) and Registration, Evaluation, Authorization, Restriction of Chemicals (REACH).

19.2    **Reporting Requirements**
(a) **RoHS Reporting:** RoHS Verification Form shall be completed by the supplier in a format acceptable to KE and its customer.  The Form shall be signed by supplier and clearly document the validity period for the certificate and commodity shipped. At KE's request, the supplier must provide objective evidence documenting the compliance status of the commodity and confirming there are no, non-exempt banned substances present.
(b) **ELV Reporting:** Suppliers shall provide the appropriate documents for KE to comply with its ELV reporting obligations, which shall include compliance with the International Material Data System (IMDS).
(c) **REACH Reporting:** REACH verification shall be completed by the supplier in a format acceptable to KE and its customer.  All solderable commodities must be marked per IPC/JEDEC JESD97 and IPC-1066 with district symbols/labels to clearly indicate the Pb-Free nature of the commodity.
(d) **General:** KE's specific requirements for RoHS, ELV and REACH can be found in KE Global Supplier Environmental Compliance Requirements manual, which shall be available upon request.
(e) If there is a change to the materials or substances in the supplier's product after initial submittal, the supplier shall resubmit the disclosure utilizing the KE SMCR process.

19.3    **Product Safety**
(a) Supplier shall have documented processes for the management of product-safety related products and manufacturing processes.
(b) Automotive suppliers are required to have a Product Safety Representative designated, and conduct proper product safety training for product-safety related products and processes,
(c) Product-safety identification may be in product prints, specifications, purchase order or other forms of documented requirements.  Supplier can confirm product-safety requirements with the KE purchasing contact.

## 20.0   Material Age
20.1    **General Requirements**
(a) KE expects that all material will be compliant with the purchase order age requirements.
(b) KE's general requirement shall be that all material shall be received within two (2) years of the manufacturing date.
(c) KE facilities will not accept receipt of material that has a manufacture date code older than two (2) years at the date of receipt without a KE-approved SDR waiving the age limitation.  An approved copy of the SDR must be included with the shipment.

**Kimball Electronics, Inc.**
Global Supplier Quality Manual

(d) Material shipped to any KE facility that is older than two (2) years and does not have ~~an approved SDR~~ will be considered non-conforming and shall be handled under the guideline of section 5.0 Handling of Non-Conforming Material.

**20.2   Specific Requirements**
(a) Specific requirements removing the two (2) year limitation will be based on the individual parts and/or programs and will be reviewed/established as early in the program development as possible.
(b) Material shipped to any KE facility providing an exception to the two (2) year limitation does not require an approved SDR.
(c) Specific requirements as to the age of material can be adjusted based on corrective/improvement activities and shall be in the sole discretion of the KE location providing the exception and receiving the product.
(d) When specific age limitations are allowed, the specific requirements shall only be valid for the specific KE location.
(e) Shipping products not authorized by a specific requirement shall be considered a non-conforming part and subject to KE's general age requirements.

## 21.0  Safe Launch Requirements
**21.1   General Requirements**
(a) The purpose of the Safe Launch activity is to ensure the success of the product launch from the material perspective. By increasing the inspection frequency on key processes and/or adding additional inspection actions for elements that have been identified as a potential risk, the objective is to identify issues prior to creating non-conforming material.  The heightened manufacturing conditions remain in place until the program has been proven to be capable and the parts being created meet the needs and expectations of the customer.
(b) The quality requirement/expectation for supplied components is Zero (0) Defects throughout the duration of the Safe Launch timeframe. Timeframe is based upon customer requirement.
(c) This expectation is applied to the entire supply chain, including the processes post the KE facility and any field concerns.
(d) Defects of significant nature, either internal or external to the supplier, can result in the restart of the Safe Launch requirements.

**21.2   ~~Submission and Reporting Requirements~~**
~~(a) Specific requirements are based on individual programs and will be reviewed/presented during the early developmental stages of the program.~~
~~(b) Safe launch plan shall be submitted per KE request (e.g. during component approval phase, any changes) with usage of form agreed between KE and supplier.~~
~~(c) Safe launch results reporting~~
~~(d) Results of the safe launch shall be reported to KE, as agreed between supplier and KE (including reports of defects found in the supplier's production process).~~
~~(e) Safe launch may be closed only under KE approval.~~

## 22.0  Controlled Shipment Requirements
**22.1   General Requirements**
(a) Should a situation arise where KE must take an active participative role in ensuring that the material being supplied to any KE facility meets the required quality level, that supplier shall be placed on a Controlled Shipment status.  The issue or issues that are creating the need for the Controlled Shipment status will be clearly communicated to the supplier, and an agreement detailing the specific actions required by the supplier will be negotiated and agreed to by all parties involved.
(b) Control level is determined by the appropriate KE facility and based on the severity of the issue and determines who will provide the resources to accomplish the inspection activities.
(c) Levels are not progression or escalation steps; based on the severity of the situation, the supplier can be placed on any level of Control Ship status.
(d) Under Control Ship status, material must be 100% inspected against criteria/standards agreed between KE and supplier.

**Kimball Electronics, Inc.**
Global Supplier Quality Manual

(e) Material must be properly labeled with all appropriate identifications per section 13.2 Special Labeling of Shipments and any additional requirements per the agreed to inspection plan.

(f) When supplier is placed on a Controlled Shipment status by one of KE facilities, each shipment to all KE facilities must be properly labeled.

(g) Control Shipment conditions will remain in place until KE gives the supplier an authorization to remove them.

**22.2   Control Shipment Level 1 (CS 1)**
(a) Material is 100% controlled within the supplier's facility and inspected by supplier resources.
(b) Inspection must occur in a controlled location outside of the normal production area.
(c) Inspection records must be maintained with findings reported to KE, per the agreed to inspection plan.

**22.3   Control Shipment Level 2 (CS 2)**
(a) Material is 100% controlled within the supplier's facility and inspected by an approved 3rd party organization, agreed to by KE.
(b) Inspection must occur in a controlled location outside of the normal production area.
(c) Inspection records must be maintained with findings reported to KE, per the agreed to inspection plan.

 ~~Supplier will be responsible for the expenses of the 3rd party.~~

**22.4   Control Shipment Level 3 (CS 3)**
(a) Material is controlled at an off-site location and inspected by an approved 3rd party organization, agreed to by KE.
(b) Supplier will be responsible for the expenses of the 3rd party.

## 23.0   Franchised Distributors
**23.1   General Requirements**
**(a) All franchised distributors must have full component traceability of the product provided by the original manufacturer.  Traceability shall be provided with delivery of the product to KE.**
(b) All distributors shall provide Product Change Notices (PCN's) for the components they represent with the designated representatives for each KE facility.  These notices must be provided in a timely manner to ensure KE and its customers can understand if last time buy or design change activities will be required.
(d) All material supplied by authorized distributors shall be material for which the distributor is franchised (as evidenced by their line card) by the manufacturer to supply, otherwise written approval is required by KE and all criteria of Section 23 shall be met.
(e) All non-franchised distributors are considered Independent Distributors/Brokers.  See Section 24.

## 24.0   Independent Distributors/Brokers Requirements
**24.1   General Requirements**
(a)  Prior to the procurement of any applicable products, Independent Distributors / Brokers must be approved by the assigned KE Qualification Team which includes Purchasing / Sourcing and Supplier Quality.
(b)  To be approved, the following requirements must be met:
- Signoff of the current KE Global Supplier Quality Manual (GSQM) Acceptance
- Successful completion of an On-Site Audit

(c)  A fully-executed Vendor Supplier Agreement (VSA) and / or have executed the following agreements independently:
- Down Stream Liability Agreement
- Broker Traceability Agreement
- Non-Disclosure Agreement
- Company Specific Contractual Agreements

**Kimball Electronics, Inc.**
Global Supplier Quality Manual

## 25.0 Counterfeit Part Mitigation

Supplier expressly warrants that all products will be free from any counterfeit material.

(a) All suppliers are expected to put into place steps to decrease the occurrence of and mitigate the effect of attempted counterfeiting and or the creation of counterfeit materials.  (Ref AS6081, AS 5553)

Any product containing counterfeit material shall be deemed defective.

(b) Recommended steps should include:

- Employee Awareness
- Appropriate detection techniques
- Compliance with local regulatory disposition laws
- Compliance to Local Counterfeit reporting laws

(c) All suppliers are expected to timely report any occurrence of material being counterfeited and/or containing counterfeit parts and to prevent it from continuing to impact KE facilities or KE's customers.

(d) Supplier agrees that any material received by KE suspected to be counterfeit should be contained by KE. Upon determination that the material is suspect counterfeit, supplier authorizes KE to destroy the counterfeit material thereby removing it from the supply chain.  Supplier acknowledges that KE must comply with certain regulatory requirements including but not limited to, reporting to local regulatory groups, such as the Government Industry Data Exchange Program (GIDEP), and not releasing suspect material from its control.

**Kimball® Electronics, Inc.**
Global Supplier Quality Manual

## KE Global Supplier Quality Manual (GSQM) Acceptance form

| Supplier Name<br>*supplier with multiple locations shall complete ONE GSQM Acceptance Form* | | Contact Person<br>*only 1 contact per supplier* | |
|---|---|---|---|
| Location(s)<br>*use additional pages as needed* | | Job Title | |
| Address(es) | | Phone | |

**Industry Type(s):**
☐ **Automotive**    ☐ **Medical**    ☐ **Industrial**    ☐ **Defense, Aerospace and Public Safety**

**Confirmation of Acceptance of KE GSQM**
☐ **Accepted** – KE requirements will be meet without reservations.
☐ **Accepted with exceptions** – KE requirements can be met with exception as identified below.*
☐ **Rejected** – KE requirements are considered to be not feasible by supplier.

**Exception List**   * Exceptions must be documented in the table below and will be a subject to KE's approval process.

| Item # | Paragraph # | Supplier Comment / Proposal (use additional sheets if required) |
|---|---|---|
| | | SEE COMMENTS |
| | | |
| | | |
| | | |
| | | |
| | | |

***Supplier Sign-Off***

| Natalie Paull | Quality Systems Manager | 05/11/2021 |
|---|---|---|
| Name | Title | Date    (MM/DD/YYYY) |

**KE Plant Sign-Off ****
**Only when exceptions need to be considered.
☐ Accepted – All listed exceptions may be considered as waived for the supplier.
☐ Rejected – Exceptions listed above are considered to be not acceptable for KE manufacturing site.

| | | |
|---|---|---|
| Name | Title | Date    (MM/DD/YYYY) |

**Kimball® Electronics, Inc.**
Global Supplier Quality Manual

**For Internal Use Only**

| Quality and Materials Managers Approving | | | |
|---|---|---|---|
| KEJ Quality Manager | | KEJ Materials Manager | |
| KEPS Quality Manager | | KEPS Materials Manager | |
| KETL Quality Manager | | KETL Materials Manager | |
| KEMX Quality Manager | | KEMX Materials Manager | |
| KECN Quality Manager | | KECN Materials Manager | |
| KETA Quality Manager | | KETA Materials Manager | |
| KERO Quality Manager | | KERO Materials Manager | |
| KEIND Quality Manager | | KEIND Materials Manager | |

| DISTRIBUTION LIST | |
|---|---|
| KE CEO | General Managers |
| VP of Business Development | Director of Global Purchasing |
| VP of Finance | Global Quality Systems (KEJ QS Manager) |
| VP of North American Operations | E-Business Systems Analyst |
| VP of European Operations | Global Supplier Quality Council |
| VP of Asian Operations | Global Quality and Materials Councils |

Case 3:23-cv-00139-RLY-CSW   Document 23-2   Filed 07/24/23   Page 34 of 56 PageID #: 41

3C01-2307-PL-000428
Dubois Circuit Court

Filed 7/26/2023 10:35 AM
Clerk
Dubois County, Indiana

# Kimball
## Electronics

Kimball Electronics Group, LLC
1038 E. 15th Street
Jasper IN  47546
USA

# Purchase order

ISO 14001 Certified

Send Date:  08/27/2021

| **Vendor Address** |
| --- |
| Direct Components, Inc.<br>5439 Beaumont Center Blvd. Ste 1040<br>Tampa FL  33634<br>USA |

| **Information** | |
| --- | --- |
| **PO Number** | 4502820617 |
| **PO Date** | 05/18/2021 |
| **Vendor No.** | 40000361 |
| **Currency** | USD |
| **Payment Terms** | Net 30 Days |
| **Buyer** | Ben Popp |
| **Phone No./Fax No.** | 812-634-4189 / 812-634-4600 |
| **Email** | Ben.Popp@kimballelectronics.com |
| **Shipping terms** | |
| | Page  1 of   3 |

| **Ship To:** |
| --- |
| **Kimball Electronics Group**<br>**1038 East 15th Street**<br>**JASPER IN  47546**<br>**USA** |

| **Bill To:** |
| --- |
| KEG.AP.Invoice@KimballElectronics.com<br>Or Mail To Our NEW ADDRESS:<br>Kimball Electronics Group, LLC<br>1205 Kimball Blvd.<br>Jasper IN  47546<br>USA |

| Item | Material/Description | Quantity | UM | Net Price | Net Amount |
| --- | --- | --- | --- | --- | --- |
| 0020 | BNDX1KEJ0174<br>IC, GENERAL PURPOSE AUDIO QFN32<br>**Delivery date:  06/28/2021**<br>**Manufacturer Part Number:**<br>Asahi Kasei Microsystems Co.          AK4951AEN<br>Asahi Kasei Microsystems Co.          AK4951EN<br>**Tax: TAX EXEMPT**<br>Product Hierarchy: BNDX1<br>MSD = 1<br>RoHS Required<br>PARTS MUST BE SUPPLIED ON THE FOLLOWING MEDIA TYPE:<br>T&R<br>Supplier shall comply with the Kimball Global Supplier Quality Manual (GSQM)<br>http://www.kimballelectronics.com/docs/default-source/gsqm/keg_global_supplier_quality_manual.pdf **Automotive Standards Apply**<br>MATERIAL SHALL COMPLY WITH ANY APPLICABLE<br>QUALITY CLAUSES LOCATED AT<br>https://www.kimballelectronics.com/qc<br><br>**Total quantity delivered      6,000    EA**<br>**\*\*\* Item completely delivered \*\*\*** | 6,000 | EA | 19,900.00<br>per /1,000 | 119,400.00 |
| | | | | Total excl. Tax | **119,400.00** |

A packing list must accompany each shipment. To insure prompt payment on shipments, mail invoice in duplicate, showing our purchase order, and with bill of lading attached to Kimball Electronics Inc., immediately after shipment is made. Goods subject to our inspection on arrival, not withstanding prior payment to obtain cash discount. Our suppliers are evaluated in accordance to quality, price, and delivery performance.

By

_____  Ben Popp



**EXHIBIT**
**2**

# Kimball
### Electronics

Kimball Electronics Group, LLC
1038 E. 15th Street
Jasper IN  47546
USA

# Purchase order

PO Number  4502820617

Page  2 of   3

| Item | Material/Description | Quantity | UM | Net Price | Net Amount |
|------|---------------------|----------|-----|-----------|------------|

**Standard Notes and Conditions**

It is the responsibility of the supplier to meet 100% on-time delivery and quality requirements of this order. Kimball reserves the right to reschedule or cancel product.

Unless other shipping arrangements have been made with Kimball Electronics Purchasing, please refer to the Kimball Electronics Routing Instructions letter located at  http://www.kimballelectronics.com/docs/default-source/gsqm/keg_routing_instructions.pdf

If importing to Kimball Electronics directly, please include importer id number 35-207920400 in the Ship To address of the shipping documents and the commercial invoice.

Please note that purchase order numbers must be provided to all freight carriers.

**Expedited freight must be reported.**

**An acknowledgement is required to confirm the receipt of this document and to confirm the delivery quantities and dates.**

FAR and DFAR Flow Down Provisions may apply to this purchase order.  Kimball Electronics FAR and DFAR Flow Down Provisions are available at www.kimballelectronics.com/documentation

**Kimball Electronics**

# Purchase order

Kimball Electronics Group, LLC
1038 E. 15th Street
Jasper IN  47546
USA

PO Number  4502820617

Page  3 of   3

## CONDITIONS OF PURCHASE

### MATERIAL SCHEDULE
Along with this purchase order ("Purchase Order") Kimball will provide to Seller oral or written instructions regarding quantities and delivery dates ("Material Schedule"). This Purchase Order and Material Schedule are hereinafter collectively referred to as the "Order". Seller shall not make material commitments or production arrangements in excess of the amount or in advance of the time necessary to meet Kimball's Order. Kimball's acceptance of any products produced or shipped in excess of the terms of this Order shall not constitute a waiver, change, alteration or amendment of any of the terms of this Order.

### AGREEMENT
Seller agrees to and accepts each of the terms in this Order or explicitly incorporated herein by reference. The Order may be accepted only on terms which precisely match the terms of the Order; all other terms proposed by Seller in addition to or different from the Order are expressly rejected by Kimball. This Order, together with material explicitly incorporated herein by reference, sets forth the entire and only agreement between the parties regarding the subject matter hereof and supersedes any and all prior or contemporaneous agreements, understandings, or proposals whether written or oral, between the parties. No terms and conditions other than those included on this Order shall be binding on Kimball unless accepted in writing by Kimball. It isagreed that no prior course of dealing or course of performance between the parties or usage of trade not expressly set forth in this Order shall be admissible to explain, modify or contradict this Agreement in any way or manner.

### TRANSPORTATION
Transportation Charges are "DAP, Deliver at Place" for U.S. deliveries with all Duty Paid for all international (Incoterms 2020), unless specified otherwise. Excessive freight costs caused by noncompliance with Kimball's written or verbal routing instructions will be assumed by the seller. Likewise, if Kimball's Material Schedule is not met, Seller will bear freight costs which are in excess of normal costs of an on-time delivery. In the absence of written or verbal routing instructions, Seller shall ship by the most economical surface transportation while meeting industry standards for packing/shipping. A completed ISF Transmittal form must be received by the ISF team at ordisfteam@ups.com with a copy to logistics/buyer at the Kimball Electronics location receiving the shipment no later than 72 hours prior to container loading at origin to avoid filing delays. Any receiving fees and fines for errors shall be Seller's responsibility. Seller must instruct their carriers not to load containers until they have confirmation of the ISF acceptance.

### NONCOMPLIANCE WITH MATERIAL SCHEDULE
Neither Seller nor Kimball shall be liable for any delay or failure to perform its respective obligations resulting directly or indirectly fromacts of God, strikes or other unavoidable causes beyond such parties' responsible control, excepting its own negligence. If Seller does not comply with Kimball's Material Schedule, Kimball may, at its option, either submit a revised Material Schedule or cancel this Order at no cost to Kimball.

### REJECTIONS
If any of the products ordered are found at any time not to conform to Sellers warranties herein, Kimball shall have the following options, in its sole discretion: (a) reject and return such products at Seller's expense, (including incoming and return transportation costs); (b) require Seller to replace the nonconforming products on a revised Material Schedule; and/or (c) require Seller to inspect the products and remove defective products and replace with conforming products. If Seller fails to promptly make the necessary inspection, removal and replacement, Kimball may perform the necessary inspection and sorting of defective products at a reasonable charge to Seller. In addition, the Seller shall be liable for any costs or expenses incurred directly or indirectly by Kimball from the rejected products, including but not limited to labor and materials that may have been applied to or used on the rejected products prior to the point that it was determined such products were defective.

### KIMBALL'S PROPERTY
All tools, equipment or material of every description furnished and/or consigned to Seller by Kimball shall be and remain the personal property of Kimball. Such property, and wherever practical each individual item thereof, shall be plainly marked or otherwise adequately identified by Seller as Kimball's property and shall be safely stored separate and apart from Seller's property. Seller shall not substitute any property for Kimball's property and shall not use such property except in filling Kimball's Orders. Seller will, at its expense, fully insure such property against loss, theft or damage in an amount equal to the replacement cost with loss payable to Kimball and shall protect Kimball's property against any third party claim. At Kimball's direction, Seller shall ship such property to Kimball in the same condition as originally received or manufactured by the Seller, reasonable wear and tear excepted.

### CHANGES
Kimball reserves the right to make changes of any kind (including quantity) in this Order. If such changes affect delivery or piece price, Seller shall notify Kimball in writing within ten (10) days and negotiate an adjustment. Seller is obligated to minimize the effect of any changes including, but not limited to, diverting material for other uses.

### MANUFACTURING DEVIATIONS
Seller shall not change the material components, manufacturing process, or methods used in production of the products covered by this Order without Kimball's prior written consent.

### PAYMENT
Payment terms are net 60 days from the date Kimball receives Sellers invoice. Amounts owed are payable in U.S. dollars, and prices quoted by Seller are deemed to include all taxes and freight.

### ASSIGNMENT
Seller may not assign this Order without Kimball's written consent.

### SET-OFF
Kimball shall have the right to set-off any amount owing from Seller to Kimball (or any of its affiliated companies) against any amount payable by Kimball in connection with this Order.

### COMPLIANCE WITH LAWS
To the extent applicable, Seller shall comply with all federal, state or local laws, rules, regulations and orders which may be applicable to this Order or Seller, all of which are incorporated herein by reference and made a part hereof, and Seller agrees to incorporate the foregoing provisions in all subcontracts under this Order. **Seller and its subcontractor shall abide by the requirements of 41 CFR §§ 60-1.4(a) ,60-300.5(a) and 60-741.5(a). These regulations prohibit discrimination against qualified individuals based on their status as protected veterans or individuals with disabilities, and prohibit discrimination against all individuals based on their race, color, religion, sex (including pregnancy, gender identity, and sexual orientation), national origin, age (>40), or genetic information. Moreover, these regulations require that covered prime contractors and subcontractors take affirmative action to employ and advance in employment individuals without regard to any of the above categories.** To the extend not exempt, Buyer complies with Executive Order 11246, as amended, and the applicable regulations contained in 41 C.F.R. Parts 60-1 through 60-60; 29 U.S.C. Section 793 and the applicable regulations contained in 41 C.F.R. Part 60-741; 38 U.S.C. Section 4212 and the applicable regulations contained in 41 C.F.R. Part 60-250 and/or 60-300; and 29 C.F.R. Part 471, Appendix A. All other applicable provisions of the Rules and Regulations of the Office of Federal Contract Compliance Programs, Equal Employment Opportunity Commission and Department of Labor are hereby incorporated by reference. Further, to the extent applicable, Seller warrants that each chemical substance constituting or contained in products sold or otherwise transferred to Kimball hereunder, which is required or permitted to be reported for the inventory of chemical substances published by the EPA pursuant to the Toxic Substance Control Act (15 USC Sec. 2601 et. seq.), is as of the time of sale or transfer on the list of such substances published by the Administrator of the EPA, and furthermore such chemical substances are to be properly labeled as required by the Hazardous Substance Act (15 USC Sec. 1261 et. seq.). Seller also certifies to its compliance with all applicable provisions of the Occupational Safety and Health Act of 1970, as amended, and its rules, regulations, safety and health standards and general duty obligation, in order to furnish its employees and the employees of Buyer with whom it may contact "employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or serious physical harm". Seller will comply with all applicable import / export laws, including but not limited to ITAR and EAR, as applicable.

### FAIR LABOR STANDARDS ACT
In accepting this Order, Seller represents that the products to be furnished hereunder were or will be produced in compliance with applicable requirements of the Fair Labor Standards Act of 1938, as amended, and unless otherwise agreed in writing, Seller shall insert a certificate on all invoices submitted in connection with this Order stating that the products covered by the invoice were produced in compliance with the requirements of the Fair Labor Standards Act of 1938, as amended, including Sections 6, 7 and 12(a) and regulations and orders of the Wage and Hour Division issued under Section 14.

### CONFIDENTIAL INFORMATION
Any product knowledge or information which Seller discloses to Kimball shall not be deemed confidential or proprietary information of the Seller unless Kimball agrees otherwise in writing. Any product knowledge or information which Kimball discloses to Seller shall deemed confidential or proprietary information of Kimball and shall be treated by Seller with the same reasonable standard of care and confidentiality with which Seller treats its own confidential and proprietary information. All original materials created by Seller for Kimball pursuant to this Order will be considered, at the time of delivery to Kimball or its designee, works made for hire, and such works of joint authorship, and the copyrights therein will be owned by Kimball. To the extent that such paid for materials may not be held to be works made for hire, Seller hereby assigns the sole right, title and interest in such materials to Kimball, and Kimball may register the copyrights in such materials.

### INFRINGEMENT
Seller warrants that any products and services provided hereunder do not infringe the rights of any person. Seller will indemnify and hold Kimball harmless from any and all loss, damage, cost or expense (including attorney fees) resulting from any claim, suit or action for infringement relating to the services or products provided under this Order. All products provided hereunder include a global, freely transferable, nonrevocable license for any IP associated with the products. Any original inventions created by Seller's agents for Kimball pursuant to this Order will be transferred to Kimball at its sole choosing. Seller shall assist without charge any assignment by its agent which may be required.

### INDEMNIFICATION
Seller shall indemnify, hold harmless and defend Kimball, its parent, subsidiaries and affiliated companies and their respective officers, directors, agents and customers from any costs, damages, expenses (including reasonable attorneys' fees), or other losses arising from any suits, proceedings or causes of action brought against Kimball in connection with the products or services provided hereunder in the event that (i) such products or services do not conform with the SQM, design or other specifications, (ii) the materials used by Seller are defective, or (iii) the materials used or products supplied by Seller are subject to or cause any recall or similar action. Seller shall also indemnify Kimball against all losses due to injury or to death of any person and damage to or loss of any property arising from allegedly defective products or services provided to Kimball or any party adjudged  legally entitled to compensation.

### FOR WORK ON PREMISES
If Seller's work under this Order involves operations by Seller on the premises of Kimball or one of its customers, Seller shall take all necessary precautions to prevent the occurrence of any injury to person or property during the progress of such work. Seller shall indemnify and hold harmless Kimball against all loss (including attorney fees) which may result in any way from any act or omission of the Seller, its agents, employees or subcontractors. Seller shall maintain such Public Liability, Property Damage, Worker's Compensation and other insurance necessary to protect Kimball from said risks.

### INSOLVENCY
If Seller: (1) ceases to conduct its operations in the normal course of business; (2) is unable to meet its obligations (as they mature); (3) becomes subject to any proceedings under the bankruptcy or insolvency laws; (4) has a receiver appointed or applied for; (5) makes an assignment for the benefit of creditors, then Kimball may terminate this Order without liability except for conforming products already delivered and accepted. HEADINGS Paragraph headings are for reference only and shall not be construed to limit or modify any of the terms contained herein.

### LIMITATION OF RIGHTS
The terms of this Order do not in any manner whatsoever limit or restrict any right or remedies provided to a Kimball pursuant to the Uniform Commercial Code or any other laws. This Order shall be governed by the laws of the State of Indiana, United States of America, excluding any conflicts or choice of law rule or principle that might otherwise refer construction or interpretation of these Terms to the substantive law of another jurisdiction. Any action or proceeding seeking to enforce the terms of these Terms, or based on any right arising out of these Terms or transactions hereunder, must be brought in state court of competent jurisdiction located in Dubois County, Indiana, USA, or if jurisdiction will be permit, in the Federal District Court for the Southern District of Indiana located in Evansville, Indiana, USA., and the parties hereto consent to the jurisdiction and venue of said courts. No waiver of a breach of any provisions of this Order shall be deemed by reason of Kimball's acceptance of materials or any ordered payment for them, or constitute a waiver of any other breach or waiver of such provision. If any term or provision is adjudged to be invalid or illegal or is struck down by a court of law or equity, the remaining terms, and provisions shall continue in force.

### WARRANTIES
Seller warrants and represents that all products sold under this Order will be of merchantable quality, free from all defects in design, workmanship and materials, and will be fit for the particular purposes for which they are intended, and that the products are provided in strict accordance with the specifications and/or samples, drawings, designs or other requirements (including performance specifications) supplied. Seller also expressly warrants and represents that all products sold under this Order will conform to the requirements of Kimball's Global Supplier Quality Manual (see link: www.kimballelectronics.com/home/kegroup/GSQM/KEG_Global_Supplier_Quality_Manual.pdf) Seller warrants and represents that all services provided hereunder will be performed by competent personnel, will conform to Kimball's specifications and will meet or exceed best industry standards. Such warranties shall survive delivery. At Kimballs option, Seller will promptly replace or repair non-conforming products or services or refund amounts paid therefore.

### PARTIES
For purposes of this Order, "Kimball" means Kimball Electronics Inc., and any of its affiliated entities purchasing services or products hereunder, and "Seller" means the party identified in the Purchase Order.

### INTERNATIONAL TERMS
Notwithstanding anything to the contrary set forth above, this Purchase Order may be supplemented and amended by provisions prepared and attached by Kimball with respect to the laws applicable to a jurisdiction outside of the United States of America.

# Kimball
**Electronics**

Kimball Electronics Group, LLC
1038 E. 15th Street
Jasper IN  47546
USA

# Purchase order

**ISO 14001 Certified**

Send Date:  08/27/2021

## Vendor Address

Direct Components, Inc.
5439 Beaumont Center Blvd. Ste 1040
Tampa FL  33634
USA

## Information

| | |
|---|---|
| **PO Number** | 4502815356 |
| **PO Date** | 05/13/2021 |
| **Vendor No.** | 40000361 |
| **Currency** | USD |
| **Payment Terms** | Net 30 Days |
| **Buyer** | VMI Ben Popp |
| **Phone No./Fax No.** | 812-634-4189 / 812-634-4600 |
| **Email** | Ben.Popp@kimballelectronics.com |
| **Shipping terms** | |

Page  1 of  3

## Ship To:

**Kimball Electronics Group**
**1038 East 15th Street**
**JASPER IN  47546**
**USA**

## Bill To:

KEG.AP.Invoice@KimballElectronics.com
Or Mail To Our NEW ADDRESS:
Kimball Electronics Group, LLC
1205 Kimball Blvd.
Jasper IN  47546
USA

| Item | Material/Description | Quantity | UM | Net Price | Net Amount |
|------|---------------------|----------|----|-----------|-----------|
| 0010 | 1180169<br>TRANS, IRF5210 D2PAK<br>**Delivery date:  06/23/2021**<br>Manufacturer Part Number:<br>Infineon Technologies Americas Corp     IRF5210STRLPBF<br>**Tax: TAX EXEMPT**<br>Product Hierarchy: BNDX1<br>MSD = 1<br>RoHS Required<br>PARTS MUST BE SUPPLIED ON THE FOLLOWING MEDIA TYPE:<br>T&R<br>Supplier shall comply with the Kimball Global Supplier Quality Manual (GSQM)<br>http://www.kimballelectronics.com/docs/default-source/gsqm/keg_global_supplier_quality_manual.pdf: **Automotive Standards Apply**<br>MATERIAL SHALL COMPLY WITH ANY APPLICABLE<br>QUALITY CLAUSES LOCATED AT<br>https://www.kimballelectronics.com/qc<br><br>**Total quantity delivered**      5,000    EA<br>**\*\*\* Item completely delivered \*\*\*** | 5,000 | EA | 3,220.00<br>per /1,000 | 16,100.00 |
| | | | | Total excl. Tax | **16,100.00** |

A packing list must accompany each shipment. To insure prompt payment on shipments, mail invoice in duplicate, showing our purchase order, and with bill of lading attached to Kimball Electronics Inc., immediately after shipment is made. Goods subject to our inspection on arrival, not withstanding prior payment to obtain cash discount. Our suppliers are evaluated in accordance to quality, price, and delivery performance.

By

_____  VMI Ben Popp



EXHIBIT
**3**

# Kimball
## Electronics

Kimball Electronics Group, LLC
1038 E. 15th Street
Jasper IN  47546
USA

# Purchase order

PO Number  4502815356

Page  2 of   3

| Item | Material/Description | Quantity | UM | Net Price | Net Amount |
|------|----------------------|----------|-----|-----------|------------|
| | **Standard Notes and Conditions** | | | | |
| | It is the responsibility of the supplier to meet 100% on-time delivery and quality requirements of this order. Kimball reserves the right to reschedule or cancel product. | | | | |
| | Unless other shipping arrangements have been made with Kimball Electronics Purchasing, please refer to the Kimball Electronics Routing Instructions letter located at  http://www.kimballelectronics.com/docs/default-source/gsqm/keg_routing_instructions.pdf | | | | |
| | If importing to Kimball Electronics directly, please include importer id number 35-207920400 in the Ship To address of the shipping documents and the commercial invoice. | | | | |
| | Please note that purchase order numbers must be provided to all freight carriers. | | | | |
| | **Expedited freight must be reported.** | | | | |
| | **An acknowledgement is required to confirm the receipt of this document and to confirm the delivery quantities and dates.** | | | | |
| | FAR and DFAR Flow Down Provisions may apply to this purchase order.  Kimball Electronics FAR and DFAR Flow Down Provisions are available at www.kimballelectronics.com/documentation | | | | |

# Kimball Electronics

Kimball Electronics Group, LLC
1038 E. 15th Street
Jasper IN  47546
USA

# Purchase order

PO Number  4502815356

Page  3 of  3

## CONDITIONS OF PURCHASE

### MATERIAL SCHEDULE
Along with this purchase order ("Purchase Order") Kimball will provide to Seller oral or written instructions regarding quantities and delivery dates ("Material Schedule"). This Purchase Order and Material Schedule are hereafter collectively referred to as the "Order". Seller shall not make material commitments or production arrangements in excess of the amount or in advance of the time necessary to meet Kimball's Order. Kimball's acceptance of any products produced or shipped in excess of the terms of this Order shall not constitute a waiver, change, alteration or amendment of any of the terms of this Order.

### AGREEMENT
Seller agrees to and accepts each of the terms in this Order explicitly incorporated herein by reference. The Order may be accepted only on terms which precisely match the terms of the Order; all other terms proposed by Seller in addition to or different from the Order are expressly rejected by Kimball. This Order, together with material explicitly incorporated herein by reference, sets forth the entire and only agreement between the parties regarding the subject matter hereof and supersedes any and all prior or contemporaneous agreements, understandings, or proposals whether written or oral, between the parties. No terms and conditions other than those included on this Order shall be binding on Kimball unless accepted in writing by Kimball. It isagreed that no prior course of dealing or course of performance between the parties or usage of trade not expressly set forth in this Order shall be admissible to explain, modify or contradict this Agreement in any way or manner.

### TRANSPORTATION
Transportation Charges are "DAP, Deliver at Place" for U.S. deliveries with all Duty Paid for all international (Incoterms 2020), unless specified otherwise. Excessive freight costs caused by noncompliance with Kimball's written or verbal routing instructions will be assumed by the seller. Likewise, if Kimball's Material Schedule is not met, Seller will bear freight costs which are in excess of normal costs of an on-time delivery. In the absence of written or verbal routing instructions, Seller shall ship by the most economical surface transportation while meeting industry standards for packing/shipping. A completed ISF Transmittal form must be received by the ISF team at ordisfteam@ups.com with a copy to logistics/buyer at the Kimball Electronics location receiving the shipment no later than 72 hours prior to container loading at origin to avoid filing delays. Any resulting fees and fines for errors shall be Seller's responsibility. Seller must instruct their carriers not to load containers until they have confirmation of the ISF acceptance.

### NONCOMPLIANCE WITH MATERIAL SCHEDULE
Neither Seller nor Kimball shall be liable for any delay or failure to perform its respective obligations resulting directly or indirectly fromacts of God, strikes or other unavoidable causes beyond such parties' responsible control, excepting its own negligence. If Seller does not comply with Kimball's Material Schedule, Kimball may, at its option, either submit a revised Material Schedule or cancel this Order at no cost to Kimball.

### REJECTIONS
If any of the products ordered are found at any time not to conform to Sellers warranties herein, Kimball shall have the following options, in its sole discretion: (a) reject and return such products at Seller's expense, (including incoming and return transportation costs); (b) require Seller to replace the nonconforming products on a revised Material Schedule; and/or (c) require Seller to inspect the products and remove defective products and replace with conforming products. If Seller fails to promptly make the necessary inspection, removal and replacement, Kimball may perform the necessary inspection and sorting of defective products at a reasonable charge to Seller. In addition, the Seller shall be liable for any costs or expenses incurred directly or indirectly by Kimball from the rejected products, including but not limited to labor and materials that may have been applied to or used on the rejected products prior to the point that it was determined such products were defective.

### KIMBALL'S PROPERTY
All tools, equipment or material of every description furnished and/or consigned to Seller by Kimball shall be and remain the personal property of Kimball. Such property, and wherever practical each individual item thereof, shall be plainly marked or otherwise adequately identified by Seller as Kimball's property and shall be safely stored separate and apart from Seller's property. Seller shall not substitute any property for Kimball's property and shall not use such property except in filling Kimball's Orders. Seller will, at its expense, fully insure such property against loss, theft or corruption in an amount equal to the replacement cost with loss payable to Kimball and shall protect Kimball's property against any third party claim. At Kimball's direction, Seller shall ship such property to Kimball in the same condition as originally received or manufactured by the Seller, reasonable wear and tear excepted.

### CHANGES
Kimball reserves the right to make changes of any kind (including quantity) in this Order. If such changes affect delivery or piece price, Seller shall notify Kimball in writing within ten (10) days and negotiate an adjustment. Seller is obligated to minimize the effect of any changes including, but not limited to, diverting material for other uses.

### MANUFACTURING DEVIATIONS
Seller shall not change the material components, manufacturing process, or methods used in production of the products covered by this Order without Kimball's prior written consent.

### PAYMENT
Payment terms are net 60 days from the date Kimball receives Sellers invoice. Amounts owed are payable in U.S. dollars, and prices quoted by Seller are deemed to include all taxes and freight.

### ASSIGNMENT
Seller may not assign this Order without Kimball's written consent.

### SET-OFF
Kimball shall have the right to set-off any amount owing from Seller to Kimball (or any of its affiliated companies) against any amount payable by Kimball in connection with this Order.

### COMPLIANCE WITH LAWS
To the extent applicable, Seller shall comply with all federal, state or local laws, rules, regulations and orders which may be applicable to this Order or Seller, all of which are incorporated herein by reference and made a part hereof, and Seller agrees to incorporate the foregoing provisions in all subcontracts under this Order. **Seller and its subcontractor shall abide by the requirements of 41 CFR §§ 60-1.4(a) ,60-300.5(a) and 60-741.5(a). These regulations prohibit discrimination against qualified individuals based on their status as protected veterans or individuals with disabilities, and prohibit discrimination against all individuals based on their race, color, religion, sex (including pregnancy, gender identity, and sexual orientation), national origin, age (>40), or genetic information. Moreover, these regulations require that covered prime contractors and subcontractors take affirmative action to employ and advance in employment individuals without regard to any of the above categories.**
To the extent not exempt, Buyer complies with Executive Order 11246, as amended, and the applicable regulations contained in 41 C.F.R. Parts 60-1 through 60-60; 29 U.S.C. Section 793 and the applicable regulations contained in 41 C.F.R. Part 60-741; 38 U.S.C. Section 4212 and the applicable regulations contained in 41 C.F.R. Part 60-250 and/or 60-300; and 29 C.F.R. Part 471, Appendix A. All other applicable provisions of the Rules and Regulations of the Office of Federal Contract Compliance Programs, Equal Employment Opportunity Commission and Department of Labor are hereby incorporated by reference. Further, to the extent applicable, Seller warrants that each chemical substance constituting or contained in products sold or otherwise transferred to Kimball hereunder, which is required or permitted to be reported for the inventory of chemical substances published by the EPA pursuant to the Toxic Substance Control Act (15 USC Sec. 2601 et. seq.), is as of the time of sale or transfer on the list of such substances published by the Administrator of the EPA, and furthermore such chemical substances are to be properly labeled as required by the Hazardous Substance Act (15 USC Sec. 1261 et. seq.). Seller also certifies to its compliance with all applicable provisions of the Occupational Safety and Health Act of 1970, as amended, and its rules, regulations, safety and health standards and general duty obligation, in order to furnish its employees and the employees of Buyer with whom it may contact "employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or serious physical harm". Seller will comply with all applicable import / export laws, including but not limited to ITAR and EAR, as applicable.

### FAIR LABOR STANDARDS ACT
In accepting this Order, Seller represents that the products to be furnished hereunder were or will be produced in compliance with applicable requirements of the Fair Labor Standards Act of 1938, as amended, and unless otherwise agreed in writing, Seller shall insert a certificate on all invoices submitted in connection with this Order stating that the products covered by the invoice were produced in compliance with the requirements of the Fair Labor Standards Act of 1938, as amended, including Sections 6, 7 and 12(a) and regulations and orders of the Wage and Hour Division issued under Section 14.

### CONFIDENTIAL INFORMATION
Any product knowledge or information which Seller discloses to Kimball shall not be deemed confidential or proprietary information of the Seller unless Kimball agrees otherwise in writing. Any product knowledge or information which Kimball discloses to Seller shall deemed confidential or proprietary information of Kimball and shall be treated by Seller with the same reasonable standard of care and confidentiality with which Seller treats its own confidential and proprietary information. All original materials created by Seller for Kimball pursuant to this Order will be considered, at the time of delivery to Kimball or its designee, works made for hire, and the copyrights therein will be owned by Kimball. To the extent that such paid for materials may not be held to be works made for hire, Seller hereby assigns the sole right, title and interest in such materials to Kimball, and Kimball may register the copyrights in such materials.

### INFRINGEMENT
Seller warrants that any products and services provided hereunder do not infringe the rights of any person. Seller will indemnify and hold Kimball harmless from any and all loss, damage, cost or expense (including attorney fees) resulting from any claim, suit or action for infringement relating to the services or products provided under this Order. All products provided hereunder include a global, freely transferable, nonrevocable license for any IP associated with the products. Any original inventions created by Seller's agents for Kimball pursuant to this Order will be transferred to Kimball at its sole choosing. Seller shall assist without charge any assignment by its agent which may be required.

### INDEMNIFICATION
Seller shall indemnify, hold harmless and defend Kimball, its parent, subsidiaries and affiliated companies and their respective officers, directors, agents and customers from any costs, damages, expenses (including reasonable attorneys' fees), or other losses arising from any suits, proceedings or causes of action brought against Kimball in connection with the products or services provided hereunder in the event that (i) such products or services do not conform with the SQM, design or other specifications, (ii) the materials used by Seller are defective, or (iii) the materials used or products supplied by Seller are subject to or cause any recall or similar action. Seller shall also indemnify Kimball against all losses due to injury or to death of any person and damage to or loss of any property arising from allegedly defective products or services provided to Kimball or any party adjudged legally entitled to compensation.

### FOR WORK ON PREMISES
If Seller's work under this Order involves operations by Seller on the premises of Kimball or one of its customers, Seller shall take all necessary precautions to prevent the occurrence of any injury to person or property during the progress of such work. Seller shall indemnify and hold harmless Kimball against all loss (including attorney fees) which may result in any way from any act or omission of the Seller, its agents, employees or subcontractors. Seller shall maintain such Public Liability, Property Damage, Worker's Compensation and other insurance necessary to protect Kimball from said risks.

### INSOLVENCY
If Seller: (1) ceases to conduct its operations in the normal course of business; (2) is unable to meet its obligations (as they mature); (3) becomes subject to any proceedings under the bankruptcy or insolvency laws; (4) has a receiver appointed or applied for; (5) makes an assignment for the benefit of creditors, then Kimball may terminate this Order without liability except for conforming products already delivered and accepted. HEADINGS Paragraph headings are for reference only and shall not be construed to limit or modify any of the terms contained herein.

### LIMITATION OF RIGHTS
The terms of this Order shall in no manner whatsoever limit or restrict any right or remedies provided to a Kimball pursuant to the Uniform Commercial Code or any other laws. This Order shall be governed by the laws of the State of Indiana, United States of America, excluding any conflicts or choice of law rule or principle that might otherwise refer construction or interpretation of these Terms to the substantive law of another jurisdiction. Any action or proceeding seeking to enforce the terms of these Terms, or based on any right arising out of these Terms or transactions hereunder, must be brought in state court of competent jurisdiction located in Dubois County, Indiana, USA, or if jurisdiction will permit, in the Federal District Court for the Southern District of Indiana located in Evansville, Indiana, USA., and the parties hereto consent to the jurisdiction and venue of said courts. No waiver of a breach of any provisions of this Order shall be deemed by reason of Kimball's acceptance of materials or any ordered payment for them, or constitute a waiver of any other breach or waiver of such provision. If any term or provision is adjudged to be invalid or illegal or is struck down by a court of law or equity, the remaining terms, and provisions shall continue in force.

### WARRANTIES
Seller warrants and represents that all products sold under this Order will be of merchantable quality, free from all defects in design, workmanship and materials, and will be fit for the particular purposes for which they are intended, and that the products are provided in strict accordance with the specifications and/or samples, drawings, designs or other requirements (including performance specifications) supplied. Seller also expressly warrants and represents that all products sold under this Order will conform to the requirements of Kimball's Global Supplier Quality Manual (see link: www.kimballelectronics.com/home/kegroup/GSQM/KEG_Global_Supplier_Quality_Manual.pdf) Seller warrants and represents that all services provided hereunder will be performed by competent personnel, will conform to Kimball's specifications and will meet or exceed best industry standards. Such warranties shall survive delivery. At Kimballs option, Seller will promptly replace or repair non-conforming products or services or refund amounts paid therefor.

### PARTIES
For purposes of this Order, "Kimball" means Kimball Electronics Inc., and any of its affiliated entities purchasing services or products hereunder, and "Seller" means the party identified in the Purchase Order.

### INTERNATIONAL TERMS
Notwithstanding anything to the contrary set forth above, this Purchase Order may be supplemented and amended by provisions prepared and attached by Kimball with respect to the laws applicable to a jurisdiction outside of the United States of America.

# Kimball
## Electronics

Kimball Electronics Group, LLC
1038 E. 15th Street
Jasper IN  47546
USA

# Purchase order

**ISO 14001 Certified**

Send Date:  08/27/2021

| **Information** | |
|---|---|
| **PO Number** | 4502839837 |
| **PO Date** | 06/11/2021 |
| **Vendor No.** | 40000361 |
| **Currency** | USD |
| **Payment Terms** | Net 30 Days |
| **Buyer** | Ben Popp |
| **Phone No./Fax No.** | 812-634-4189 / 812-634-4600 |
| **Email** | Ben.Popp@kimballelectronics.com |
| **Shipping terms** | |
| | Page  1 of   3 |

### Vendor Address

Direct Components, Inc.
5439 Beaumont Center Blvd. Ste 1040
Tampa FL  33634
USA

### Ship To:
**Kimball Electronics Group**
**1038 East 15th Street**
**JASPER IN  47546**
**USA**

### Bill To:
KEG.AP.Invoice@KimballElectronics.com
Or Mail To Our NEW ADDRESS:
Kimball Electronics Group, LLC
1205 Kimball Blvd.
Jasper IN  47546
USA

| Item | Material/Description | Quantity | UM | Net Price | Net Amount |
|---|---|---|---|---|---|
| 0010 | BNDX1KEJ0170<br>SENSOR, DIGITAL OUTPUT 1.8V LGA14<br>**Delivery date:  07/23/2021**<br>Manufacturer Part Number:<br>STMicroelectronics                    LSM6DS3USTR<br>**Tax: TAX EXEMPT**<br>Product Hierarchy:  BNDX1<br>MSD = 3<br>RoHS Required<br>PARTS MUST BE SUPPLIED ON THE FOLLOWING MEDIA TYPE:<br>T&R<br>Supplier shall comply with the Kimball Global Supplier Quality Manual (GSQM)<br>http://www.kimballelectronics.com/docs/default-source/gsqm/keg_global_supplier_quality_manual.pdf: **Automotive Standards Apply**<br>MATERIAL SHALL COMPLY WITH ANY APPLICABLE<br>QUALITY CLAUSES LOCATED AT<br>https://www.kimballelectronics.com/qc<br><br>**Total quantity delivered**        3,300    EA<br>**\*\*\* Item completely delivered \*\*\*** | 3,300 | EA | 48,000.00<br>per /1,000 | 158,400.00 |
| | | | Total excl. Tax | | **158,400.00** |

A packing list must accompany each shipment. To insure prompt payment on shipments, mail invoice in duplicate, showing our purchase order, and with bill of lading attached to Kimball Electronics Inc., immediately after shipment is made. Goods subject to our inspection on arrival, not withstanding prior payment to obtain cash discount. Our suppliers are evaluated in accordance to quality, price, and delivery performance.

By

_____ Ben Popp



EXHIBIT
**4**

# Kimball
## Electronics

Kimball Electronics Group, LLC
1038 E. 15th Street
Jasper IN  47546
USA

# Purchase order

PO Number  4502839837

Page  2 of   3

| Item | Material/Description | Quantity | UM | Net Price | Net Amount |
|------|----------------------|----------|----|-----------|------------|

**Standard Notes and Conditions**

It is the responsibility of the supplier to meet 100% on-time delivery and quality requirements of this order. Kimball reserves the right to reschedule or cancel product.

Unless other shipping arrangements have been made with Kimball Electronics Purchasing, please refer to the Kimball Electronics Routing Instructions letter located at  http://www.kimballelectronics.com/docs/default-source/gsqm/keg_routing_instructions.pdf

If importing to Kimball Electronics directly, please include importer id number 35-207920400 in the Ship To address of the shipping documents and the commercial invoice.

Please note that purchase order numbers must be provided to all freight carriers.

**Expedited freight must be reported.**

**An acknowledgement is required to confirm the receipt of this document and to confirm the delivery quantities and dates.**

FAR and DFAR Flow Down Provisions may apply to this purchase order.  Kimball Electronics FAR and DFAR Flow Down Provisions are available at www.kimballelectronics.com/documentation

**Kimball**
**Electronics**

Kimball Electronics Group, LLC
1038 E. 15th Street
Jasper IN  47546
USA

# Purchase order

PO Number  4502839837

Page  3 of  3

## CONDITIONS OF PURCHASE

### MATERIAL SCHEDULE

Along with this purchase order ("Purchase Order") Kimball will provide to Seller oral or written instructions regarding quantities and delivery dates ("Material Schedule").   This Purchase Order and Material Schedule are hereinafter collectively referred to as the "Order".  Seller shall not make material commitments or production arrangements in excess of the amount or in advance of the time necessary to meet Kimball's Order.   Kimball's acceptance of any products produced or shipped in excess of the terms of this Order shall not constitute a waiver, change, alteration or amendment of any of the terms of this Order.

### AGREEMENT

Seller agrees to and accepts each of the terms in this Order or explicitly incorporated herein by reference. The Order may be accepted only on terms which precisely match the terms of the Order; all other terms proposed by Seller in addition to or different from the Order are expressly rejected by Kimball. This Order, together with material explicitly incorporated herein by reference, sets forth the entire and only agreement between the parties regarding the subject matter hereof and supersedes any and all prior or contemporaneous agreements, understandings, or proposals whether written or oral, between the parties. No terms and conditions other than those included on this Order shall be binding on Kimball unless accepted in writing by Kimball. It isagreed that no prior course of dealing or course of performance between the parties or usage of trade not expressly set forth in this Order shall be admissible to explain, modify or contradict this Agreement in any way or manner.

### TRANSPORTATION

Transportation Charges are "DAP, Deliver at Place" for U.S. deliveries with all Duty Paid for all international (Incoterms 2020), unless specified otherwise.  Excessive freight costs caused by noncompliance with Kimball's written or verbal routing instructions will be assumed by the seller.   Likewise, if Kimball's Material Schedule is not met, Seller will bear freight costs which are in excess of normal costs of an on-time delivery.  In the absence of written or verbal routing instructions, Seller shall ship by the most economical surface transportation while meeting industry standards for packing/shipping.  A completed ISF Transmittal form must be received by the ISF team at ordisfteam@ups.com with a copy to logistics/buyer at the Kimball Electronics location receiving the shipment no later than 72 hours prior to container loading at origin to avoid filing delays.  Any resulting fees and fines for errors shall be Seller's responsibility. Seller must instruct their carriers to not load containers until they have confirmation of the ISF acceptance.

### NONCOMPLIANCE WITH MATERIAL SCHEDULE

Neither Seller nor Kimball shall be liable for any delay or failure to perform its respective obligations resulting directly or indirectly fromacts of God, strikes or other unavoidable causes beyond such parties' responsible control, excepting its own negligence.  If Seller does not comply with Kimball's Material Schedule, Kimball may, at its option, either submit a revised Material Schedule or cancel this Order at no cost to Kimball.

### REJECTIONS

If any of the products ordered are found at any time not to conform to Sellers warranties herein, Kimball shall have the following options, in its sole discretion: (a) reject and return such products at Seller's expense, (including incoming and return transportation costs); (b) require Seller to replace the rejected products on a revised Material Schedule; and/or (c) require Seller to inspect the products and remove defective products and replace with conforming products.  If Seller fails to promptly make the necessary inspection, removal and replacement, Kimball may perform the necessary inspection and sorting of defective products at a reasonable charge to Seller.  In addition, the Seller shall be liable for any costs or expenses incurred directly or indirectly by Kimball from the rejected products, including but not limited to labor and materials that may have been applied to or used on the rejected products prior to the point that it was determined such products were defective.

### KIMBALL'S PROPERTY

All tools, equipment or material of every description furnished and/or consigned to Seller by Kimball shall be and remain the personal property of Kimball.  Such property, and wherever practical each individual item thereof, shall be plainly marked or otherwise adequately identified by Seller as Kimball's property and shall be safely stored separate and apart from Seller's property.  Seller shall not substitute any property for Kimball's property and shall not use such property except in filling  Kimball's Orders.  Seller will, at its expense, fully insure such property against loss, theft or corruption in an amount equal to the replacement cost with loss payable to Kimball and shall protect Kimball's property against any third party claim.  At Kimball's direction, Seller shall ship such property to Kimball in the same condition as originally received or manufactured by the Seller, reasonable wear and tear excepted.

### CHANGES

Kimball reserves the right to make changes of any kind (including quantity) in this Order.  If such changes affect delivery or piece price, Seller shall notify Kimball in writing within ten (10) days and negotiate an adjustment.  Seller is obligated to minimize the effect  of any changes including, but not limited to, diverting material for other uses.

### MANUFACTURING DEVIATIONS

Seller shall not change the material components, manufacturing process, or methods used in production of the products covered by this Order without Kimball's prior written consent.

### PAYMENT

Payment terms are net 60 days from the date Kimball receives Sellers invoice. Amounts owed are payable in U.S. dollars, and prices quoted by Seller are deemed to include all taxes and freight.

### ASSIGNMENT

Seller may not assign this Order without Kimball's written consent.

### SET-OFF

Kimball shall have the right to set-off any amount owing from Seller to Kimball (or any of its affiliated companies) against any amount payable by Kimball in connection with this Order.

### COMPLIANCE WITH LAWS

To the extent applicable, Seller shall comply with all federal, state or local laws, rules, regulations and orders which may be applicable to this Order or Seller, all of which are incorporated herein by reference and made a part hereof, and Seller agrees to incorporate the foregoing provisions in all subcontracts under this Order.
**Seller and its subcontractor shall alibde by the requirements of 41 CFR §§ 60-1.4(a) ,60-300.5(a) and 60-741.5(a).   These regulations prohibit discrimination against qualified individuals based on their status as protected veterans or individuals with disabilities, and prohibit discrimination against all individuals based on their race, color, religion, sex (including pregnancy, gender identity, and sexual orientation), national origin, age (>40), or genetic information. Moreover, these regulations require that covered prime contractors and subcontractors take affirmative action to employ and advance in employment individuals without regard to any of the above categories.**
To the extend not exempt, Buyer complies with Executive Order 11246, as amended, and the applicable regulations contained in 41 C.F.R. Parts 60-1 through 60-60; 29 U.S.C. Section 793 and the applicable regulations contained in 41 C.F.R. Part 60-741; 38 U.S.C. Section 4212 and the applicable regulations contained in 41 C.F.R. Part 60-250 and/or 60-300; and 29 C.F.R. Part 471, Appendix A. All other applicable provisions of the Rules and Regulations of the Office of Federal Contract Compliance Programs, Equal Employment Opportunity Commission and Department of Labor are hereby incorporated by reference. Further, to the extent applicable, Seller warrants that each chemical substance constituting or contained in products sold or otherwise transferred to Kimball hereunder, which is required or permitted to be reported for the inventory of chemical substances published by the EPA pursuant to the Toxic Substance Control Act (15 USC Sec. 2601 et. seq.), is as of the time of sale or transfer on the list of such substances published by the Administrator of the EPA, and furthermore such chemical substances are to be properly labeled as required by the Hazardous Substance Act (15 USC Sec. 1261 et. seq.).  Seller also certifies to its compliance with all applicable provisions of the Occupational Safety and Health Act of 1970, as amended, and its rules, regulations, safety and health standards and general duty obligation, in order to furnish its employees and the employees of Buyer  with whom it may contact "employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or serious physical harm". Seller will comply with all applicable import / export laws, including but not limited to ITAR and EAR, as applicable.

### FAIR LABOR STANDARDS ACT

In accepting this Order, Seller represents that the products to be furnished hereunder were or will be produced in compliance with applicable requirements of the Fair Labor Standards Act of 1938, as amended, and unless otherwise agreed in writing, Seller shall insert a certificate on all invoices submitted in connection with this Order stating that the products covered by the invoice were produced in compliance with the requirements of the Fair Labor Standards Act of 1938, as amended, including Sections 6, 7 and 12(a) and regulations and orders of the Wage and Hour Division issued under Section 14.

### CONFIDENTIAL INFORMATION

Any product knowledge or information which Seller discloses to Kimball shall not be deemed confidential or proprietary information of the Seller unless Kimball agrees otherwise in writing.  Any product knowledge or information which Kimball discloses to Seller shall deemed confidential or proprietary information of Kimball and shall be treated by Seller with the same reasonable standard of care and confidentiality with which Seller treats its own confidential and proprietary information. All original materials created by Seller for Kimball pursuant to this Order will be considered, at the time of delivery to Kimball or its designee, works made for hire, and such works of joint authorship, and the copyrights therein will be owned by Kimball. To the extent that such paid for materials may not be held to be works made for hire, Seller hereby assigns the sole right, title and interest in such materials to Kimball, and Kimball may register the copyrights in such materials.

### INFRINGEMENT

Seller warrants that any products and services provided hereunder do not infringe the rights of any person. Seller will indemnify and hold Kimball harmless from any and all loss, damage, cost or expense (including attorney fees) resulting from any claim, suit or action for infringement relating to the services or products provided under this Order. All products provided hereunder include a global, freely transferable, nonrevocable license for any IP associated with the products.  Any original inventions created by Seller's agents for Kimball pursuant to this Order will be transferred to Kimball at its sole choosing. Seller shall assist without charge any assignment by its agent which may be required.

### INDEMNIFICATION

Seller shall indemnify, hold harmless and defend Kimball, its parent, subsidiaries and affiliated companies and their respective officers, directors, agents and customers from any costs, damages, expenses (including reasonable attorneys' fees), or other losses arising from any suits, proceedings or causes of action brought against Kimball in connection with the products or services provided hereunder in the event that (i) such products or services do not conform with the SQM, design or other specifications, (ii) the materials used by Seller are defective, or (iii) the materials used or products supplied by Seller are subject to or cause any recall or similar action.  Seller shall also indemnify Kimball against all losses due to injury or to death of any person and damage to or loss of any property arising from allegedly defective products or services provided to Kimball or any party adjudged  legally entitled to compensation.

### FOR WORK ON PREMISES

If Seller's work under this Order involves operations by Seller on the premises of Kimball or one of its customers, Seller shall take all necessary precautions to prevent the occurrence of any injury to person or property during the progress of such work.  Seller shall indemnify and hold harmless Kimball against all loss (including attorney fees) which may result in any way from any act or omission of the Seller, its agents, employees or subcontractors. Seller shall maintain such Public Liability, Property Damage, Worker's Compensation and other insurance necessary to protect Kimball from said risks.

### INSOLVENCY

If Seller: (1) ceases to conduct its operations in the normal course of business; (2) is unable to meet its obligations (as they mature); (3) becomes subject to any proceedings under the bankruptcy or insolvency laws; (4) has a receiver appointed or applied for; (5) makes an assignment for the benefit of creditors, then Kimball may terminate this Order without liability except for conforming products already delivered and accepted. HEADINGS Paragraph headings are for reference only and shall not be construed to limit or modify any of the terms contained herein.

### LIMITATION OF RIGHTS

The terms of this Order do in no manner whatsoever limit or restrict any right or remedies provided to a Kimball pursuant to the Uniform Commercial Code or any other laws. This Order shall be governed by the laws of the State of Indiana, United States of America, excluding any conflicts or choice of law rule or principle that might otherwise refer construction or interpretation of these Terms to the substantive law of another jurisdiction.  Any action or proceeding seeking to enforce the terms of these Terms, or based on any right arising out of these Terms or transactions hereunder, must be brought in state court of competent jurisdiction located in Dubois County, Indiana, USA, or if jurisdiction will permit, in the Federal District Court for the Southern District of Indiana located in Evansville, Indiana, USA., and the parties hereto consent to the jurisdiction and venue of said courts. No waiver of a breach of any provisions of this Order shall be deemed by reason of Kimball's acceptance of materials or any ordered payment for them, or constitute a waiver of any other breach or waiver of such provision. If any term or provision is adjudged to be invalid or illegal or is struck down by a court of law or equity, the remaining terms, and provisions shall continue in force.

### WARRANTIES

Seller warrants and represents that all products sold under this Order will be of merchantable quality, free from all defects in design, workmanship and materials, and will be fit for the particular purposes for which they are intended, and that the products are provided in strict accordance with the specifications and/or samples, drawings, designs or other requirements (including performance specifications) supplied.  Seller also expressly warrants and represents that all products sold under this Order will conform to the requirements of Kimball's Global Supplier Quality Manual (see link:
www.kimballelectronics.com/home/kegroup/GSQM/KEG_Global_Su pplier_Quality_Manual.pdf)  Seller warrants and represents that all services provided hereunder will be performed by competent personnel, will conform to Kimball's specifications and will meet or exceed best industry standards.  Such warranties shall survive delivery.  At Kimballs option, Seller will promptly replace or repair non-conforming products or services or refund amounts paid therefore.

### PARTIES

For purposes of this Order, "Kimball" means Kimball Electronics Inc., and any of its affiliated entities purchasing services or products hereunder, and "Seller" means the party identified in the Purchase Order.

### INTERNATIONAL TERMS

Notwithstanding anything to the contrary set forth above, this Purchase Order may be supplemented and amended by provisions prepared and attached by Kimball with respect to the laws applicable to a jurisdiction outside of the United States of America.

Dubois Circuit Court

STATE OF INDIANA          )     IN THE DUBOIS CIRCUIT COURT
                         ) SS:
COUNTY OF DUBOIS      )     CAUSE NO. 19C01-2307-PL-000428

KIMBALL ELECTRONICS GROUP, LLC,   )
                                  )
         Plaintiff,          )
                                  )
        v.                     )
                                  )
DIRECT COMPONENTS, INC.,         )
                                  )
        Defendant.       )

**SUMMONS**

**TO DEFENDANT:**   **Direct Components, Inc.**
                     c/o Highest Ranking Officer
                     5439 Beaumont Center Blvd., Suite 1040
                     Tampa, FL 33634

You are hereby notified that you have been sued by the persons named "Plaintiff" and in the Court stated above. The nature of the suit against you is stated in the Complaint, which is attached to this Summons.  It also states the relief sought or the demand made against you by the Plaintiff.

An answer or other appropriate response in writing to the Complaint must be filed either by you or your attorney within twenty (20) days, commencing the day after you receive this summons (or twenty-three (23) days if this summons was received by mail), or a judgment by default may be rendered against you for the relief demanded by the Plaintiff.

If you have a claim for relief against the Plaintiff arising from the same transaction or occurrence, you must assert it in your written Answer.

If you need the name of an attorney, you may contact the Indianapolis Bar Association Lawyer Referral Service at 317-269-2222.

DATED: _____    7/26/2023
                                     _____
                                     CLERK, Dubois Circuit Court  AG

The following manner of service of this Summons is hereby designated:

   X   Registered or Certified Mail
 ___   Service on Individual by _____ County Sheriff
 ___   Service at place of employment, to wit: _____
 ___   Private Service

_/s/ Andrew W. Hull_____
Andrew W. Hull (11218-49)
awhull@hooverhullturner.com
Michael R. Limrick (23047-49)                    Dubois County Courthouse
mlimrick@hooverhullturner.com                    1 Courthouse Square, #104
Evan D. Carr (33977-49)                          Jasper, IN 47546
ecarr@hooverhullturner.com
Hoover Hull Turner, LLP                          _(812) 481-7035_____
111 Monument Circle, Suite 4400                  Telephone
P.O. Box 44989
Indianapolis, IN 46244-0989
Phone: (317) 822-4400 | Facsimile: (317) 822-0234

Elisabeth Luff (29351-63)
elisabeth.luff@kimballelectronics.com
Kimball Electronics Group, LLC
1205 Kimball Blvd.
Jasper, IN 47546
Phone: (812) 634-4354

**ACKNOWLEDGMENT OF SERVICE OF SUMMONS**

A copy of the above summons and a copy of the complaint attached thereto were received by me this _____ day of _____, 2023.

_____
Signature of Defendant

**SHERIFF'S RETURN OF SERVICE OF SUMMONS**

I hereby certify that I have served this summons on the _____ day of _____, 2023:

(1)  By delivering a copy of the Summons and a copy of the Complaint to the Defendant,

(2)  By leaving a copy of the Summons and a copy of the Complaint at which is the dwelling place or usual place of abode of and by mailing a copy of said summons to said Defendant at the above address.

(3)  Other Service or Remarks:

_____          _____
Sheriff's Costs                                    Sheriff

Dated:  _____          By: _____
                                                            Deputy

**CLERK'S CERTIFICATE OF MAILING**

I hereby certify that on the _____ day of _____, 2023, I mailed a copy of this Summons and a copy of the complaint to the Defendant, _____, by _____mail, requesting a return receipt, at the address furnished by the Plaintiff.

Dated: _____

_____
Clerk, Dubois Circuit Court
By:_____
                            Deputy

3

**RETURN OF SERVICE OF SUMMONS BY MAIL**

      I hereby certify that the attached receipt was received by me showing that the Summons and a copy of the complaint mailed to Defendant _____ was accepted by the Defendant on the _____ day of _____, 2023.

      I hereby certify that the attached return receipt was received by me showing that the Summons and a copy of the complaint was returned not accepted on the _____ day of _____, 2023.

      I hereby certify that the attached return receipt was received by me showing that the Summons and a copy of the complaint mailed to Defendant _____ was accepted by _____ _____.

Dated:_____

_____
               Clerk of the Dubois Circuit Court

By:_____
               Deputy

4

STATE OF INDIANA      )      IN THE DUBOIS CIRCUIT COURT
                     ) SS:
COUNTY OF DUBOIS      )      CAUSE NO. ____19C01-2307-PL-000428____

KIMBALL ELECTRONICS GROUP, LLC,      )
                                         )
                 Plaintiff,      )
                                         )
                 v.      )
                                         )
DIRECT COMPONENTS, INC.,      )
                                         )
                 Defendant.      )

## E-FILING APPEARANCE BY ATTORNEY IN CIVIL CASE

1.      The party on whose behalf this form is being filed is:

     Initiating __X__   Responding ____   Intervening _____; and

     the undersigned attorney and all attorneys listed on this form now appear in this case for the following parties:

     Name of party    Plaintiff, Kimball Electronics Group, LLC

     Address of party *(see Question #5 below if this case involves a protection from abuse order, a workplace violence restraining order, or a no-contact order)*

      1205 Kimball Blvd.
      Jasper, IN 47546

     Telephone # of party:  (812) 634-4000

2.      Attorney information for service as required by Trial Rule 5(B)(2)

> Andrew W. Hull (11218-49)
> awhull@hooverhullturner.com
> Michael R. Limrick (23047-49)
> mlimrick@hooverhullturner.com
> Evan D. Carr (33977-49)
> ecarr@hooverhullturner.com
> HOOVER HULL TURNER LLP
> Attorneys at Law
> 111 Monument Circle, Suite 4400
> P.O. Box 44989
> Indianapolis, IN  46244-0989
> Phone: (317) 822-4400 | Fax: (317) 822-0234
>
> Elisabeth Luff (29351-63)
> elisabeth.luff@kimballelectronics.com
> Kimball Electronics Group, LLC
> 1205 Kimball Blvd.
> Jasper, IN 47546
> Phone: (812) 634-4354

**IMPORTANT**:  Each attorney specified on this appearance:

(a)     certifies that the contact information listed for him/her on the Indiana Supreme Court Roll of Attorneys is current and accurate as of the date of this Appearance;

(b)     **acknowledges that all orders, opinions, and notices from the court in this matter that are served under Trial Rule 86(B) will be sent to the attorney at the email address(es) specified by the attorney on the Roll of Attorneys regardless of the contact information listed above for the attorney;** and

(c)     understands that he/she is solely responsible for keeping his/her Roll of Attorneys contact information current and accurate, see Ind. Admis. Disc. R. 2(A).

Attorneys can review and update their Roll of Attorneys contact information on the Courts Portal at http://portal.courts.in.gov.

3.      This is a Civil Plenary case type as defined in administrative Rule 8(B)(3).

4.  This case involves child support issues. Yes____  No __X__ *(If yes, supply social security numbers for all family members on a separately attached document filed as confidential information on **light green paper**. Use Form TCM-TR3.1-4.)*

5.  This case involves a protection from abuse order, a workplace violence restraining order, or a no-contact order. Yes____  No __X__ *(If Yes, the initiating party must provide an address for the purpose of legal service but that address should not be one that exposes the whereabouts of petitioner.)* The party shall use the following address for purposes of legal service:

    _____        Attorney's address

    _____        The Attorney General Confidentiality program address
                    (contact the Attorney General at 1-800-321-1907 or e-mail address
                    is confidential@atg.in.gov).

    _____        Another address (provide) _____

This case involves a petition for involuntary commitment. Yes____  No __X__

6.  If Yes above, provide the following regarding the individual subject to the petition for involuntary commitment:

    a.  Name of the individual subject to the petition for involuntary commitment if it is not already provided in #1 above:

    b.  State of Resident of person subject to petition: _____

    c.  At least one of the following pieces of identifying information:

        i.  Date of Birth _____

        ii. Driver's License Number _____

            State where issued _____ Expiration date _____

        iii. State ID number _____

            State where issued _____ Expiration date _____

        iv. FBI number _____

       v. Indiana Department of Corrections Number _____

      vi. Social Security Number is available is being provided in an attached confidential document

7. There are related cases: Yes _____ No _X___

8. Additional information required by local rule: ___n/a_____

9. There are other party members: Yes____ No _X__ *(If yes, list on continuation page.)*

10. This form has been served on all other parties and Certificate of Service is attached:  Yes_X__ No _____

                              Respectfully submitted,

                              */s/ Andrew W. Hull*_____
                              Andrew W. Hull (11218-49)
                              awhull@hooverhullturner.com

                              */s/ Michael R. Limrick*_____
                              Michael R. Limrick (23047-49)
                              mlimrick@hooverhullturner.com

                              */s/ Evan D. Carr*_____
                              Evan D. Carr (33977-49)
                              ecarr@hooverhullturner.com

                              HOOVER HULL TURNER LLP
                              111 Monument Circle, Suite 4400
                              P.O. Box 44989
                              Indianapolis, IN 46244-0989
                              Tel.: (317) 822-4400 | Fax: (317) 822-0234

                              */s/ Elisabeth Luff*_____
                              Elisabeth Luff (29351-63)
                              elisabeth.luff@kimballelectronics.com
                              Kimball Electronics Group, LLC
                              1205 Kimball Blvd.
                              Jasper, IN 47546

Tel: (812) 634-4354

*Counsel for Plaintiff,*
*Kimball Electronics Group, LLC*

# Case # 19C01-2307-PL-000428 - Kimball Electronics Group, LLC v. D

## Envelope Information

**Envelope Id**
26296180

**Submitted Date**
8/24/2023 1:53 PM EST

**Submitted User Name**
drew.miroff@icemiller.com

## Case Information

**Location**
Dubois Circuit Court

**Category**
Civil

**Case Type**
PL - Civil Plenary

**Case Initiation Date**
7/26/2023

**Case #**
19C01-2307-PL-000428

**Assigned to Judge**
Verkamp, Nathan A

## Filings

**Filing Type**
EFileAndServe

**Filing Code**
Appearance

**Filing Description**
Appearance of Drew Miroff and Angela
Rinehart for Defendant

**Client Reference Number**
072890.10001

**Filing on Behalf of**
Direct Components, Inc.

**Filing Status**
Submitting

### Lead Document

| File Name | Description | Security | Download |
|---|---|---|---|
| State Court Appearance.pdf | State Court Appearance.pdf | Public document | Original File |

## eService Details

| | Firm | Served | Date Opened |
|---|---|---|---|
| Support | | | |
| Not Sent   Michael Limrick | Hoover Hull Turner LLP | No | Not Opened |

| Status | Name | Firm | Served | Date Opened |
|---|---|---|---|---|
| Not Sent | Andrew W Hull | Hoover Hull Turner LLP | No | Not Opened |
| Not Sent | Evan Carr | Hoover Hull Turner LLP | No | Not Opened |
| Not Sent | Andrew J. Miroff | Ice Miller LLP | No | Not Opened |
| Not Sent | Angela Rinehart | Ice Miller LLP | No | Not Opened |

◄                                                                                                                          ►

# Fees

◄                                                                                                                          ►

**Appearance**

| Description | Amount |
|---|---|
| Filing Fee | $0.00 |
| | **Filing Total:** $0.00 |

| | |
|---|---|
| Total Filing Fee | $0.00 |
| | **Envelope Total:** $0.00 |

| **Transaction Amount** | $0.00 | |
|---|---|---|
| **Transaction Id** | 38865893 | |
| **Filing Attorney** | Andrew Miroff | **Order Id** |
| **Transaction Response** | Authorized | |

© 2023 Tyler Technologies
Version: 2022.0.3.9946

STATE OF INDIANA      )              **IN THE DUBOIS COUNTY CIRCUIT COURT**

                         ) SS:

**COUNTY OF DUBOIS**    )              **CAUSE NO. 19C01-2307-PL-000428**

**KIMBALL ELECTRONICS, LLC,**    )
                                    )
         **Plaintiff,**          )
                                    )
    **v.**                        )
                                    )
**DIRECT COMPONENTS, INC.,**    )
                                    )
         **Defendant.**        )

## E-FILING APPEARANCE BY ATTORNEYS IN CIVIL CASE

**This Appearance Form must be filed on behalf of every party in a civil case.**

1. The party on whose behalf this form is being filed is:
   Initiating_____      Responding   X      Intervening \_\_\_\_\_ ; and

   the undersigned attorney and all attorneys listed on this form now appear in this case for the following parties:

   Name of party      Direct Components, Inc.

2. Attorney information for service as required by Trial Rule 5(B)(2)

   Andrew J. Miroff, Atty. No. 21749-49
   ICE MILLER LLP
   One American Square, Suite 2900
   Indianapolis, IN 46282
   (317) 236-2100
   drew.miroff@icemiller.com

   Angela M. Rinehart, Atty. No. 34753-49
   ICE MILLER LLP
   One American Square, Suite 2900
   Indianapolis, IN 46282
   (317) 236-2100
   angela.rinehart@icemiller.com

   **-IMPORTANT**: Each attorney specified on this appearance:

   (a)    certifies that the contact information listed for him/her on the Indiana Supreme Court Roll of Attorneys is current and accurate as of the date of this Appearance;

     (b)      **acknowledges that all orders, opinions, and notices from the court in this matter that are served under Trial Rule 86(G) will be sent to the attorney at the email address(es) specified by the attorney on the Roll of Attorneys regardless of the contact information listed above for the attorney**; and

     (c)      understands that he/she is solely responsible for keeping his/her Roll of Attorneys contact information current and accurate, see Ind. Admis. Disc. R. 2(A).

Attorneys can review and update their Roll of Attorneys contact information on the Courts Portal at http://portal.courts.in.gov.

3. This is a __PL__ case type as defined in administrative Rule 8(B)(3).

4. This case involves child support issues. Yes _____ No _X__ *(If yes, supply social security numbers for all family members on a separately attached document filed as confidential information on **light green paper**. Use Form TCM-TR3.1-4.)*

5. This case involves a protection from abuse order, a workplace violence restraining order, or a no – contact order.  Yes _____ No _X__ *(If Yes, the initiating party must provide an address for the purpose of legal service but that address should not be one that exposes the whereabouts of a petitioner.)*  The party shall use the following address for purposes of legal service:

This case involves a petition for involuntary commitment.  Yes _____ No __X___

6. If Yes above, provide the following regarding the individual subject to the petition for involuntary commitment:

7. There are related cases: Yes _____ No _X__ *(If yes, list on continuation page.)*

8. Additional information required by local rule:

   _____

9. There are other party members: Yes _____ No _X__ *(If yes, list on continuation page.)*

10. This form has been served on all other parties and Certificate of Service is attached:

   Yes _X__   No _____

Respectfully submitted,

ICE MILLER LLP

 */s/ Andrew J. Miroff*
Andrew J. Miroff, Atty. No. 21749-49
Angela M. Rinehart, Atty. No. 34753-49
One American Square, Suite 2900
Indianapolis, IN 46282-0200
Telephone:  (317) 236-2100
Facsimile:  (317) 236-2219
drew.miroff@icemiller.com
angela.rinehart@icemiller.com

## CERTIFICATE OF SERVICE

I certify that on August 24, 2023, I electronically filed the foregoing document using the Indiana E-Filing System (IEFS), and the same was served upon all counsel of record via IEFS.

*/s/ Andrew J. Miroff*
Andrew J. Miroff

ICE MILLER LLP
One American Square
Suite 2900
Indianapolis, IN  46282
(317) 236-2100
drew.miroff@icemiller.com

3

4873-9271-7944.1